GARTIN'S GROCERY, Appellee, v. LUCAS COUNTY CO-OPERATIVE CREAMERY ASSOCIATION, Appellant.

No. 45542.

December 9, 1941.

G. C. Stuart and A. V. Hass, for appellee.

H. V. Levis and Alan Loth, for appellant.

Mitchell, J.—This is an action brought by Gartin's Grocery, which is a trade name under which Keith Gartin operated in the town of Chariton, Iowa, against the Lucas County Cooperative Creamery Association, in which he seeks to recover for the value of butter that was not delivered to him and for which he paid. The answer was a general denial. Later an amendment to the answer was filed as follows:

"(1) Admits it engaged in sale of butter; alleges it used care to protect all, including plaintiff, who purchased butter against being defrauded or injured because of acts or failures

of defendant's employees; and if plaintiff overpaid the employee for butter it did not receive, the loss was wholly due to plaintiff's lack of care and caution, plaintiff's negligence causing any such loss and defendant being free of any negligence contributing thereto.

"(2) Defendant did not know or have reason to suspect any want of integrity of its employees or to suspect that any employee would not deliver the butter ordered or paid for by plaintiff; and if plaintiff paid for the butter scheduled in his (first) amendment, such payment was not made to defendant, which received no money for any butter there scheduled."

 Count 3 of the answer set up an affirmative defense of settlement. There was a second amendment filed to the answer but it simply amended the defense of settlement. To this was filed a reply. A jury was waived and the case tried to the court which returned a verdict in favor of the plaintiff in the amount of $1,400 plus interest and costs. Both sides have appealed but the Lucas County Co-operative Creamery Association having first appealed, it is designated as the appellant and the Gartin's Grocery as the appellee and cross-appellant. The Gartin's Grocery is a retail grocery store located in the town of Chariton, Iowa. The Lucas County Co-operative Creamery Association is engaged in the manufacture and sale of butter at wholesale to the retail merchants in the territory in which it operates. Appellant conducts its business in the following manner. It employed a man by the name of Elder who drove a truck belonging to the appellant. At the beginning of the day the truck would be loaded at the creamery with butter in bricks of a pound or less, packed in fifty pound cases. It would be checked into the truck and Elder would then start to deliver and sell the butter to the customers on his route. As far as the sale to the appellee in this case is concerned, the manner of sale was as follows: Elder would come to the Gartin store in the morning. He would ascertain from either Gartin or one of his employes how much butter was needed. He would place the butter in the cooler which was in the middle of the store. In compliance with the instruction of the creamery company and using a machine furnished him by the appellant, he would make out a sales slip of the amount of butter which he had delivered.

This slip was made on a recording apparatus. The original was on top; then there was a carbon paper which made a carbon copy. At times the amount of butter delivered would be checked by an employe or by Gartin to see that the amount which had been placed on the slip was the correct amount but of course it was always checked as against the original because the original was the only part of the memorandum that could be seen. After this was done Elder would take the original and copy out of this recording apparatus, the original being returned to the creamery and he would then change the copy, increasing the amount of butter that he said he had delivered. This copy was then taken to the cashier, who was in another part of the store, and he was paid the amount shown on the copy. This continued over a period of time from August 4, 1937 to September 9, 1938. There is no dispute but during this period of time the appellee paid for 9,685 pounds more butter than was delivered to him and which amounted in dollars and cents to $2,989.42. After the discovery of the fraudulent manner in which the butter had been handled, Gartin informed the creamery and there were various meetings between Elder, the directors of the creamery, and Gartin. Elder finally paid a sum of money of somewhere around $1,355, the balance being the amount for which this suit was brought. The appellant in a very able and elaborate brief bases its right to a reversal on the claim that there must be a contract, actual or implied, on which it would be liable. The contract in this case was one made by the appellant through its agent Elder for the sale to Gartin of certain amounts of butter. The case was tried below upon the theory that the appellee had paid the appellant for 9,685 pounds of butter that he never received and we can see no difference between whether the appellee seeks to recover the value of butter purchased paid for and not delivered or whether he seeks to recover the overpayment of money he paid appellant for butter purchased and not delivered. Elder was not merely a delivery boy. He was the salesman of the appellant; he was the collector for the appellant. He was authorized and directed to prepare a record of each sale on the machine furnished him, keep the original ticket for return to the creamery and present the duplicate to the purchaser and collect the amount due for the

butter delivered. The sole question as we see it is whether he was acting within the scope of his employment at the time that he changed the amount on the duplicate which he presented for payment to Gartin. Elder was the representative of the appellant. It hired him. It sent him out as its agent. It gave him the authority to do all these things. It does not deny that he was within the scope of his employment in presenting a duplicate slip and collecting for 25 pounds of butter, if that is what was delivered but it says if this slip was changed from 25 to 50 pounds and this amount was collected, that he was only acting one half within the scope of his employment and apparent authority and that the other one half of the transaction was not within the scope of his employment and apparent authority.

The case of Berkovitz v. Morton-Gregson Company, 112 Neb. 154, 198 N. W. 868, 33 A. L. R. 85, is almost identical with the factual situation that confronts us here. In that case, the plaintiff ran a retail meat market and defendant packing company had one Kleeberger for its salesman. Kleeberger took orders from the plaintiff and sent them to his company, who filed them. The account was paid weekly. It was the company practice to send at the end of each week a copy of the plaintiff's account with it to the agent Kleeberger, who would call upon the plaintiff the following Monday morning and receive a check payable to defendant company. Kleeberger would indorse this check with a rubber stamp bearing defendant company's name and deposit the proceeds therefrom in defendant company's account at the Omaha National Bank. About January 1, 1918, Kleeberger began altering the account statements sent to him by his company by changing the footings or totals and inserting a larger amount. Upon receiving the plaintiff's check for the increased amount, he would indorse it "Morton-Gregson Company, by B. F. Kleeberger" and deposit the proceeds in his personal account. Thereafter he would deposit the correct amount in defendant company's account. The defendant company knew nothing of the fraudulent acts of its agent nor did it accept any benefits on account thereof. We quote at length from the opinion together with some cases therein cited (pages 158–161 of 112 Neb., pages 869, 870 of 198 N. W.):

"While the statements of account were correctly made out

at the home office and sent to Kleeberger for collection, the latter, when he presented the altered and raised statements of account to plaintiff, was certainly acting for and on behalf of his principal, and was within the line of his employment. So far as plaintiff was concerned, Kleeberger, to all appearances, stood as the agent and representative of Morton-Gregson Company, and was acting within the apparent scope of his authority. Morton-Gregson Company was without question a reputable business concern, and plaintiff, we think, was justified in the belief that its agent was reliable and trustworthy, and was warranted in the belief that the trusted agent of the Morton-Gregson Company was presenting accurate and true statements of his account. That he relied on the statements as being accurate and true was beyond question. We think he was justified in so acting. The fraud was perpetrated by Kleeberger while acting within the apparent scope of his authority.

"* * *

"The rule above laid down is reaffirmed in Rehmeyer v. Lysinger, 109 Neb. 805, 192 N. W. 337.

"In Adams v. Cole, 1 Daly (N. Y.) 147, it is said:

"'A general agent or clerk employed to make sales of goods and require payment therefor, who obtains payment of false bills by fraud or deceit, held, as acting within the scope of his employment, and his principal is liable for the amount thus obtained, especially where there is some evidence, however slight, that the agent paid the sum collected to his employer.'

"Birkett v. Postal Telegraph-Cable Co., 107 App. Div. 115, 94 N. Y. Supp. 918, is a case quite similar to the one under consideration. In that case plaintiff was accustomed to send telegrams through the Postal Telegraph Company and at the end of each month to pay the agent of the company the amount due, as shown by the statements presented by the agent. The agent padded the statements and in the course of four years collected a large sum in excess of the true amount. The agent remitted the true amount to the company, as did Kleeberger in the case under consideration. The plaintiff in the Birkett Case had a list of the tariffs and charges of the company and might have, from an examination thereof, ascertained the amount which should have been paid, but he relied upon the accuracy of the

statements as presented. The court held in that case that the agent was acting within the scope of his agency in receiving the money for the benefit of defendant, and that the defendant company was liable for the fraud perpetrated by its agent.

"The case of Wilmerding v. Postal-Telegraph-Cable Co., 118 App. Div. 685, 103 N. Y. Supp. 594, was a similar case. In that case the plaintiff, when desiring to send a telegram, called one of defendant's messengers, who came and took the message and delivered it for transmission according to the general practice, and the next day the messenger would present a statement on a slip of paper to the cashier of the plaintiff, who would pay the amount and take the receipted slip. Defendant's messenger forged slips and presented them to the cashier of plaintiff who paid them. In that case the court, in the course of the opinion, said [page 687 (103 N. Y. Supp. 596)]:

" 'The question is, Is the defendant responsible to the plaintiffs for the dishonesty of its messengers? It is conceded that so far as the genuine slips are concerned, made out by the defendant's agent, Morrell, in charge of its office and given by him to the messengers, they were thereby constituted the agents of the defendant for the purpose of collecting from the plaintiffs the amounts due for services rendered as appeared upon the face of such slips. * * * But the defendant claims that these messengers were not in any sense the general agents of the defendant; that their employment was limited to the presentation of the genuine slips as given to them by the general agent, Morrell, and the collection of the sums called for thereby, and that when they forged slips and upon such forged slips collected and appropriated the sums apparently called for they acted independently and outside of their respective agencies, and that, therefore, the defendant is not liable for such fraudulent conduct.

" 'It seems to me that this contention is not sound; that the liability of the principal does not depend upon the general agency of the agent but upon the question whether the acts done were within the apparent scope of the authority of the agent, and that when it had clothed these messengers with the power to present slips and receive payment therefor, it is responsible for the wrongful acts of such agents committed in that kind of

work. The fictitious slips were intermingled with the genuine. They were both presented by the same boys to the same assistant cashier in the same ordinary way in which the dealings between the parties had been conducted for a very considerable period of time. The plaintiffs had the right to assume that the agents of the defendant, admittedly employed by it and clothed with the power to collect money on the presentation of slips, were honest and that the slips presented by them were genuine. * * * An employer who has put it within the power of his employee to defraud a third person by intermingling fraudulent and genuine bills and collecting money therefrom should be held responsible to an innocent third party for the dishonesty of his employee.' "

The Supreme Court of the United States was confronted with a very similar question in the case of Gleason v. Seaboard Railway Co., 278 U. S. 349, 353, 49 S. Ct. 161, 162, 73 L. Ed. 415. Speaking through Justice Stone, that court said:

"* * * his entire course of conduct with respect to them, including his false notice to petitioner, was in the successful pursuance of a scheme to defraud petitioner of the amount paid by it on the draft."

The lower court held for the defendant "* * * on the ground that an employer is not liable for the false statements of an agent made solely to effect a fraudulent design for his own benefit and not in behalf of the employer or his business, the court saying (p. 884 [of 21 F. 2d]): 'Under the general rule prevailing in the federal courts an employer is not liable for such conduct of his employee, Friedlander v. Texas & Pacific Ry. Co. 130 U. S. 416.'

"* * *

"And we think that the restriction of the vicarious liability of the principal adopted by the court below is supported no more by reason than by authority. Undoubtedly formal logic may find something to criticize in a rule which fastens on the principal liability for the acts of his agent, done without the principal's knowledge or consent and to which his own negligence has not contributed. But few doctrines of the law are more

firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own. * * *

"Granted the validity and general application of the rule itself, there would seem to be no more reason for creating an exception to it because of the agent's secret purpose to benefit himself by his breach of duty than in any other case where his default is actuated by negligence or sinister motives. In either case the injury to him who deals with the agent, his relationship and that of the principal to the agent's wrongful act, and the economic consequence of it to the principal in the conduct of whose business the wrong was committed, are the same.

"The arguments in favor of creating such an exception are equally objections to the rule itself. Holmes, The Common Law, (1882) 231, n. 3. But as we accept and apply the rule, despite those objections, we can find no justification for an exception which is inconsistent both with the rule itself and the underlying policy which has created and perpetuated it. We think that the Friedlander Case should be overruled so far as it supports such an exception and that the judgment of the court of appeals should be reversed."

The court in that case in reviewing the authorities which supported the rule applied by the lower court said as follows, at page 355 of 278 U. S., page 162 of 49 S. Ct.:

"The limitation upon the doctrine of respondeat superior applied by the court below finds little support other than in the passage quoted and in cases, chiefly in some of the lower federal courts purporting to follow it * * * but in those cases it was not necessary to the decision. The state courts, including those of Georgia where the cause of action arose, have very generally reached the opposite conclusion, holding that the liability of the principal for the false statement or other misconduct of the agent acting within the scope of his authority is unaffected by his secret purpose or motives."

We are of the opinion that the rule laid down in the above cited cases is more consistent with fairness than the rule of nonliability which the appellant seeks to thrust upon this court.

■ Appellant argues that the appellee should not be entitled to recover because he was guilty of negligence, because his own carelessness or negligence caused the loss. With this we cannot agree. We must take into consideration the facts in this case and we must keep ever in mind that if there was a dispute in this case, and there is evidence upon which the trial court could have found, as it did find, then we are bound by the decision of the trial court as this was a law action, a jury being waived and tried to the court. Chariton is a small Iowa city. Gartin operates a grocery store. He knew Elder and he knew the creamery company. The appellant employed Elder. It sent him out as its agent. It intrusted him with its merchandise. He was not only the delivery boy but he was the salesman; he was the collector. It gave to him this apparatus upon which to make the invoices of the amount of butter sold. It was so constructed that the only part that Gartin or his employes could see at the time the butter was checked and placed in the cooler was the original. This original the appellant required to be returned to it. The copy was the one which Elder used to defraud Gartin. There is testimony from which the court could have found that at various times this butter was checked as against the amount put in the cooler and the amount which Elder had written on the invoice but of course it was always against the original invoice and there were no alterations made on the original. Appellant argues that the alterations or changes on the copy should have been noticed. But there is no evidence that would convince one that they should have been noticed. The copies were blurred which was due to the carbon copy or the manner in which Elder, the agent of appellant, made out the copy. Clearly this question of negligence was a fact question and the court having found that Gartin was not negligent and there being sufficient evidence to justify that finding, this court will not interfere with same.

■ We come now to the question of the settlement. This was an affirmative defense and the burden of course was on the appellant. Immediately after discovery that Elder was shorting him on butter, Gartin contacted the manager of the creamery. A check was made of the original tickets returned to the

creamery with the duplicate slips that Elder had collected on and left with Gartin. It was then discovered Elder had not delivered to him the amount of butter he had collected for. Soon thereafter there was a meeting of the members of the board of appellant company together with their attorney, Elder and Gartin. There was some question there as to whether the creamery company was liable or not, Gartin maintaining that it was liable. The creamery company did not want this matter brought out in the open as it thought if the public knew the facts, it would damage the company. Later another meeting was held, at which the question came up as to the amount of money which Elder could raise. Reading over this record, we can come to no other conclusion than that there was no settlement or release agreed to by Gartin either with the creamery or Elder. True, there is some dispute in the evidence but again the lower court having sat as a jury in this case, there being evidence to sustain his finding on this proposition, same will not be disturbed by this court. Clearly upon this record the appellee was entitled to recover.

There is a cross-appeal on the part of Gartin which involves simply the question of the amount which the lower court allowed him, he claiming that he was entitled to the sum of $1,612.72 and that the lower court erred in only allowing him $1,400. No good could be accomplished by reviewing the evidence. We are convinced that the lower court was right and the judgment of the lower court is and must be affirmed on the appeal of the appellant and on the cross-appeal of the appellee.

MILLER, C. J., and STIGER, HALE, BLISS, OLIVER, SAGER, and GARFIELD, JJ., concur.

WENNERSTRUM, J., takes no part.