John SHRIER and Etta Shrier, husband and wife, a copartnership doing business as Norman Wholesale Company, and John Shrier and Etta Shrier, individually, plaintiffs in error,

v.

John L. MORRISON, Defendant in error.

No. 38143.

Supreme Court of Oklahoma.

April 5, 1960.

Rehearing Denied Nov. 22, 1960.

T. R. Benedum, Norman, for plaintiffs in error.

Luttrell & Luttrell, Norman, for defendant in error.

BLACKBIRD, Justice.

In the action involved in this appeal, the defendant in error, owner and operator of a Norman, Oklahoma, grocery or super-

market, known as Riteway Foodliner, sought, as plaintiff, the recovery, or refund, from defendants John and Etta Shrier, husband and wife, as individuals, and as co-partners d/b/a Norman Wholesale Company, of certain monies said store paid Norman Wholesale Company (hereinafter referred to merely as "Norman Wholesale", "the company", or "the wholesale company") for cigarettes and merchandise charged to, but allegedly never delivered to, or left in, his store.

Riteway Foodliner (usually hereinafter referred to merely as "Riteway" or "Riteway store") started purchasing cigarettes and other merchandise from the Company through its salesman, Billie Rae Williams, for resale to the public beginning in September, 1952, and extending into June, 1955. Said purchases were made by Williams going to the Riteway store each week and soliciting orders therefor from Glen R. Vaught, manager of Riteway's grocery department. When Riteway first began purchasing from Norman Wholesale through Williams, it, being an I. G. A. store, was obtaining much of its cigarette supply from The Fleming Company, but eventually, and largely because of premiums offered by Williams and referred to as "trade discounts", Norman Wholesale became Riteway's sole cigarette supplier. At first these premiums or trade discounts consisted of such things as steam irons and cameras given Riteway free for purchasing a certain number of cartons of cigarettes. In 1954, however, when, at plaintiff's behest, Vaught ascertained from Williams that free cigarettes could be substituted as trade discounts, for the not-so-readily saleable irons and cameras, Vaught began making all of Riteway's cigarette purchases through Williams. Under the offer Vaught accepted from Williams, Riteway began getting thirty cartons of cigarettes free, or without cost, for each five hundred cartons it purchased. Deducting from its cigarette bills the wholesale value of these free cigarettes, the brands of so-called "regular" cigarettes Riteway purchased (from Norman Whole-

sale, through Williams) at the wholesale price of $2.18 per carton, actually cost it only about $2.00 per carton.

When the orders Williams solicited from Norman Wholesale's customers were filled at its establishment in Norman, the invoices therefor were made out in triplicate. The original invoice, on white paper, and a carbon copy on yellow paper, accompanied the filled order to the purchasing store, while another copy on pink paper was kept at the wholesale company. When the merchandise was delivered to the purchasing store, it was customary for the wholesale company employee doing the delivering to give the yellow copy of the invoice to the store's clerk or employee that received it, then have the clerk sign, or initial, the original (white) invoice, and take said original back to the wholesale Company's office, as proof of the delivery. These original invoices for its customers (that had 30-day charge accounts like Riteway) thereafter stayed in the Company's office where they were posted on the customer's account; and, on the basis of these records, the monthly statement of said account was later made and forwarded to the customer.

The practice followed in plaintiff's store was for the employee who received and checked the filled orders for the store, in each instance, to sign, or initial, the invoice's yellow copy, as well as the original thereof. This yellow copy was then placed on a clip board near the store's office in which its bookkeeper, Mrs. Bailey, worked. Before the end of the month, Mrs. Bailey would remove all such yellow copies from the clip board and place them all together in a single file in the office. Then, when Williams later, during the first week in each month, presented to Mrs. Bailey, for payment, the Wholesale Company's statement for Riteway's purchases during the previous month, she would compare, with the store's copies, the list of invoices shown on said statement, and, if they were the same, issue and give Williams a check on Riteway in payment to Norman Wholesale of the total sum thus appearing to be due.

About the 5th of May, 1955, while plaintiff was out of town and Vaught was also absent from the Riteway store, Williams came to said store with a statement representing that it owed the wholesale company $5,656.68 for cigarettes and other merchandise furnished it during the immediately preceding month of April, as per invoices listed on the statement. When he presented this statement to Mrs. Bailey, she noticed numbers and charges of five invoices, of which there were no copies in her file. Despite the fact that several days before (as was her custom at the end of each month) Mrs. Bailey had removed from the clip board, all yellow copies of Norman Wholesale invoices for April reposing there, when Williams suggested that she look on the clip board again, she surprisingly found the previously absent copies. She then proceeded to issue a check from Riteway to Norman Wholesale for the total April balance shown on the statement, and handed it to Williams for delivery to his employer. However, when Vaught returned to the store the next day, Mrs. Bailey told him about the incident, showing him the five aforesaid purported invoice copies. After examining them, Vaught expressed the belief that Riteway had never received the merchandise listed thereon. Later, when plaintiff returned from his trip out of town, Vaught and Mrs. Bailey informed him of the incident, and plaintiff telephoned Norman Wholesale Company's establishment, talked to Shrier, and told him, among other things, that payment of the aforedescribed check was being stopped. When Shrier and plaintiff conferred about the matter on two later occasions, an investigation of all of the Norman Wholesale invoices Riteway had paid extending as far back as 1951, was undertaken. During the course of this investigation, plaintiff became convinced that his store had been, billed and had paid, at various times during most of that period, for merchandise of a total cost of almost $18,000 (as shown on the Wholesale Company's invoices) that it had never received, or that never became

part of its stock. When defendants refused to repay him this total amount of claimed false billing, less the value of the aforedescribed free, or premium, merchandise, Riteway had received through Williams, plaintiff instituted the present action.

In his petition, as amended after John Shrier's wife, Etta (his partner in Norman Wholesale) was made a defendant in the case, plaintiff alleged, in substance, that on more than 70 instances from September, 1952, through June, 1955, fraudulent invoices for cigarettes and tobacco products had been issued by Norman Wholesale on which Williams had forged the handwriting of various employees of plaintiff, and thereby represented plaintiff had ordered and received cigarettes and other goods or merchandise that were not delivered or left with him, though the copies thereof were secretly placed in plaintiff's place of business so as to be used in verifying and paying the wholesale company's monthly statements. Plaintiff then referred to his discovery of the fraud as to the hereinbefore mentioned April invoices, and alleged that the total amount of false and fraudulent invoices he had paid the company was $22,255.01. Plaintiff further alleged, however, that when the total price of the goods he had actually received from Norman Wholesale, during the months of April, May and June, 1955, in the amount of $4,373.93, (apparently included in the hereinbefore mentioned "stopped" check) was added to the value of the trade discounts in the sum of $800, and then subtracted from the total of the fraudulent overcharges, the difference of $17,081.08 was the amount he had paid Norman Wholesale for goods or merchandise not received. After alleging that Williams, in thus fraudulently misleading him into believing he had ordered and received more goods and merchandise than he had in fact ordered and received, was acting within the due course and scope of his employment as Norman Wholesale's agent, plaintiff prayed for judgment in the sum of $17,081.08, against the Wholesale Company and the Shriers, as defendants.

In the amended answer of John and Etta Shrier, as individuals and as co-partners d/b/a Norman Wholesale Company, they alleged, among other things, that they had no knowledge or information concerning Williams' alleged fraud, but that, if he was guilty of such acts, they were not within the scope of his authority as their agent or servant. They further alleged, in substance, that Norman Wholesale's inventories of stock on hand, when compared and reconciled with its accounts receivable, had always totalled the stock it had purchased; and that plaintiff had always promptly paid the amounts Norman Wholesale's statements to his store had represented to be due. Defendants also alleged that plaintiff had been guilty of laches over a long period, without defendants' fault, and that, had it not been for plaintiff's laches, his losses from Williams' actions, "if true, would not have occurred."

Together with their answer, defendants filed a cross petition in which they prayed judgment against plaintiff for the amount of the hereinbefore described check on which plaintiff had stopped payment, plus an additional $1,114.40, representing the wholesale price of goods and merchandise Norman Wholesale had allegedly furnished Riteway between May 1, 1955, and June 27, 1955, that allegedly had not been paid for.

Plaintiff's Reply and Answer to defendants' Cross Petition was, in substance, a general denial; and, in his separate Answer, the defendant Billie Rae Williams denied plaintiff's allegations generally, and specifically denied that he was indebted to plaintiff and that he had "ever practiced any fraud or deceit * * *" or received any money, to which he was not entitled, from plaintiff, either for himself, or John Shrier.

About the time the case was at issue, the parties, by stipulation, waived a jury trial.

Toward the end of plaintiff's evidence, the defendant Williams began testifying as a witness for plaintiff, but, after identifying himself, admitting his employment by defendants as a salesman between September, 1952, and September 1955, and that he

had called on plaintiff's store during that period, he invoked the Fifth Amendment and refused to testify further. Consequently, plaintiff relied largely upon circumstantial evidence to prove his cause of action against defendants. The evidence, as a whole, tended to indicate that the fraud, with which Williams was charged, may have been part of a general scheme, or design, he carried out over a long period, by the use of which he obtained many cartons of cigarettes at the expense of some of Norman Wholesale's customers and sold, or gave, them to others, without the defendants' knowledge or consent. It was not directly established that defendants *knowingly* benefited financially from Williams' sale of any cigarettes he obtained in such unauthorized manner.

At the close of the trial, the court rendered judgment for plaintiff as prayed for in his petition, and denied defendants the relief sought in their cross petition. After the overruling of a motion for a new trial, the defendants Mr. and Mrs. Shrier perfected this appeal.

We will continue referring to the parties hereto by their trial court designations, except when referred to by individual name.

■ The first argument defendants advance for reversal of the trial court's judgment is, in substance, that they employed Williams as only a salesman, that they never authorized him to get receipted invoices, or any other form of receipt, for merchandise *not* delivered to plaintiff's store, and that Williams' fraud resulting in said store's being billed, and paying, for merchandise it did not receive—if such did occur—was entirely outside the scope of his employment. We do not agree. We think the evidence strongly indicates that Williams was more than a salesman—at least more than an "order taker"—for the defendants; and tends to show that, in the matter of transacting Norman Wholesale's business with plaintiff, Williams' capacity was more like that of a so-called "general agent." He was not only authorized to solicit orders for the purchase of Norman

Wholesale's merchandise, but was authorized to, and regularly did, also write invoices addressed to its customers and deliver merchandise to them. It was definitely established that Williams himself delivered some of the merchandise invoiced to Riteway, after purportedly also taking its order therefor; and that he regularly made deliveries to it on Wednesdays, when the store's employees were busy with double trading stamp sales. When Shrier, as a witness for plaintiff, was queried as to Williams' duties, he described them as follows:

"A. Well, calling on the trade for orders and he would help in the store and he would also deliver, since we was a small outfit, *he would do whatever necessary,* but his primary purpose was calling on the trade for business." (Emphasis ours.)

Shrier further testified that before he "went into business" in early 1952, Williams and the witness' son "were partners in the same business * * *". Whether it was because those who, previous to that time, had known Williams as a partner in the business, were never afterward apprised of the change in his status from part-owner to salesman, or for whatever reason, it appears that as late as the latter part of 1954, Williams was cashing checks given him by Norman Wholesale's customers he called on, made payable to it for merchandise furnished them, by endorsing said checks: "Norman Wholesale Co. By B. R. Williams" or "Norman Wholesale Co. By B. R. Williams, *Partner.*" The evidence further shows that plaintiff had never met the Shriers until after the commencement of the hereinbefore described inquiry concerning the five missing invoice copies; though Williams had been known at his store, and had sold it merchandise at wholesale since 1949 or 1950; and the way plaintiff's original petition was drafted is some indication that, even when it was filed in September, 1955, Williams was believed to be a partner in the defendant wholesale company. For all that appears from the record, as far as plaintiff and/or his employees at Riteway knew (before this investigation) Williams, if not a part of Norman Wholesale Company, or its alter ego, had full authority to accomplish all things necessary to the transaction of its business with Riteway. (In this connection, see the leading case of Berkovitz v. Morton-Gregson Co., 112 Neb. 154, 198 N.W. 868, 869, 870, 33 A.L.R. 85, where the court said of the salesman, Kleeberger: "So far as plaintiff was concerned, Kleeberger, to all appearances, stood as the agent and representative of Morton-Gregson Company, and was acting within the apparent scope of his authority.")

There are cases which would seem to support the view that where the fraudulent acts of an agent, or servant, have not been authorized by his principal, or master, and the latter has no notice that they were being done, and never benefited from them, nor approved or ratified them, he is not liable to third persons upon which said agent or servant thereby inflicted injury. See Farm Bureau Co-op. Mill & Supply v. Blue Star Foods, 8 Cir., 238 F.2d 326 and Brooks v. Gray-Von Allmen Sanitary Milk Co., 211 Ky. 462, 277 S.W. 816, 46 A.L.R. 1207. However, these cases are "inapposite to the great weight of authority." Yoars v. New Orleans Linen Supply Co., La.App., 185 So. 525, 530. See also Billups Petroleum Co. v. Hardin's Bakeries Corp., 217 Miss. 24, 63 So.2d 543; Gartin's Grocery v. Lucas County Co-op. Creamery Ass'n, 231 Iowa 204, 1 N.W.2d 275; Friedman v. Parkway Baking Co., 147 Pa.Super. 552, 24 A.2d 157, and Ripon Knitting Works v. Railway Express Agency, 207 Wis. 452, 240 N.W. 840, 842. As said in the latter case 240 N.W. at page 842:

"That earlier cases may be found upon the authority of which the plaintiff should be denied a recovery cannot be doubted. The development of the law is quite well disclosed by a comparison of Friedlander v. Texas & P. R. R., 130 U.S. 416, 9 S.Ct. 570, 32 L.Ed. 991, with Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349,

49 S.Ct. 161, 162, 73 L.Ed. 415, in which case the judgment of the Circuit Court of Appeals, based on the Friedlander case, was reversed. * * In reversing the judgment, the Supreme Court of the United States said: 'We think that the restriction of the vicarious liability of the principal adopted by the court below is supported no more by reason than by authority. Undoubtedly formal logic may find something to criticize in a rule which fastens on the principal liability for the acts of his agent, done without the principal's knowledge or consent and to which his own negligence has not contributed. But few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal *without fraud of his own.* * * *

'. "'Granted the validity and general application of the rule itself, there would seem to be no more reason for creating an exception to it because of the agent's secret purpose to benefit himself by his breach of duty than in any other case where a default is actuated by negligence or similar motives. In either case the injury to him who deals with the agent, his relation and that of the principal to the agent's wrongful act, and the economic consequences of it to the principal *in the conduct of whose business the wrong was committed,* are the same, * * *'

"As the court pointed out, in cases of this kind *care must be exercised to distinguish between authority to commit a fraudulent act and authority to transact business in the course of which the fraudulent act is committed.* All of the cases holding a principal liable for the torts of his agent committed in the course of transacting the principal's business, where the acts are not authorized, involve holding a principal liable without fault on his part, whether it be for assault and battery, for fraudulent misrepresentation, for negligence, deceit, or other wrongs.

"The Restatement of the Law of Agency lays down the following proposition: 'A principal who puts an agent in a position while apparently acting within his authority, to commit a fraud upon third persons, is subject to liability to such third persons for such fraud. (Section 485) A person who would be liable to another under the rules of section 485 for injuries caused by one *who is apparently acting on his account is not relieved from liability by the fact that the agent was acting entirely for his own purposes unless the other has notice of this.'*" (Emphasis ours.)

See also Wilmerding v. Postal Telegraph Cable Co., 118 App.Div. 685, 103 N.Y.S. 594, 596, quoted extensively in the Gartin's Grocery case, supra. In the Wilmerding case, plaintiff's overcharge and excessive payment to defendant was brought about by defendant's messengers collecting for telegrams they had not delivered, but presented fictitious bills, or "slips" therefor, to plaintiff's cashier to pay. In resolving, in plaintiff's favor, the issue of whether or not the messengers were acting within the scope of their authority, the learned Justice said that when defendant "had clothed these messengers with the power to present slips and receive payment therefor, it is responsible for the wrongful acts of such agents committed *in that kind of work."* (Emphasis ours.) In the Gartin's Grocery case, the fraudulent acts of the defendant's salesman, Elder, consisted of increasing, on carbon copies of the sales slips, the amount of butter there represented to have been delivered to plaintiff, together with the charges therefor, and collecting these excessive amounts from the plaintiff. There the defendant's argument that Elder was acting *within* the scope of his authority when he billed and collected for the number of pounds of butter he delivered, but was beyond it, when he billed and collected for any amount he hadn't delivered, resembles defendants' argument in this

case. We think the unsoundness of such arguments readily appears from the Iowa Court's description of the defendant's position in that case as follows [231 Iowa 204, 1 N.W.2d 277]:

> "It (defendant) does not deny that he (Elder) was within the scope of his employment in presenting a duplicate slip and collecting for 25 pounds of butter, if that is what was delivered but it says if this slip was changed from 25 to 50 pounds and this amount was collected, that he was only acting one-half within the scope of his employment and apparent authority and that the other one-half of the transaction was not within the scope of his employment and apparent authority."

We think the present case a more compelling one for holding defendants liable for Williams' fraudulent acts than some of the cases referred to in the above-cited opinions, because his acts were not only committed in discharging the duties and exercising the authority they had given him, but they, or their company, Norman Wholesale, benefited from them in increased business and profits. Worthy of especial note is the fact that Norman Wholesale's periodic inventory of their cigarette stocks revealed no shortages or unusual losses, and as far as the record shows, said Company received its regular profits on all of the cigarettes Williams handled in the regular course of its business. For this reason, we think that, despite the diversity of previous legal precedent in cases where the principal, or master, has not benefited by the fraud of his agent, or servant, there can be no sound reason for not applying the principles of vicarious responsibility to defendants in this case. Otherwise, they would be unjustly enriched by the fraud, they placed it in the power of their agent to accomplish on unsuspecting customers.

Defendants attempted to prove that plaintiff, and his manager Vaught, by deducting the free, premium, or bonus, cigarettes, Riteway was getting from Norman Wholesale, from the cost of those it was paying for, should have known Williams was selling the latter at less than their cost to it, and thereby have had notice—or been placed upon inquiry which would have led to notice—that Williams was not acting in his employer's interest. We have carefully examined the evidence referred to, and have concluded that, though it tends to show plaintiff and Vaught knew Riteway was getting cigarettes through Williams at less than the price for which at least one other wholesaler was listing, or selling, them, it does not establish that they knew Riteway was getting the cigarettes at the same, or less than, *Norman Wholesale's* cost.

Under both their Propositions II and III, defendants refer to alleged negligence on the part of plaintiff and/or the employees of his Riteway store, as the cause of his loss. They say, in substance, that all during the period beginning in 1952, when plaintiff suffered losses by reason of paying wholesale for cigarettes which were never delivered or, if delivered, were not allowed by Williams, to remain at the store so they could be retailed, such losses would not have occurred if plaintiff's bookkeeper, Mrs. Bailey, in paying Norman Wholesale's invoices, had followed a different procedure that would have forestalled the fraud, and prevented the losses involved herein. This, like the court said of a similar idea in the Ripon Knitting Works case is an instance of "hind sight." There the court also said: "After the event it is easy to see that a number of things would have saved the situation." Whether or not it was plaintiff's duty, under the circumstances of this case, to have used some method of checking and paying Norman Wholesale's invoices that would have prevented losses, such as here occurred, and whether or not plaintiff's failure to discharge such a duty was negligence, and proximately caused his loss, were questions for the trier of facts. See Gartin's Grocery v. Lucas County Co-op. Creamery Ass'n, and Ripon Knitting Works v. Railway Express Agency, both supra.

where the agent's modus operandi and the material facts were similar to the situation which the evidence in this case tends to prove. In effect, the judgment of the trial court resolved these questions in plaintiff's favor and against the defendants. Without further lengthening this opinion to detail the evidence pertaining to them, we think it sufficient to say that said judgment, as to these issues, cannot be held to be without competent evidence reasonably tending to support it.

Our adoption of the views expressed in the cited opinions, insofar as equally applicable here, renders unnecessary any discussion of defendant's argument that said judgment is error under its Proposition III, as follows:

"When One of Two Innocent Persons Must Suffer by the Acts of a Third, the One Who Enables the Third to Occasion the Loss Must Sustain It."

■ Nor do we find merit in defendants' argument, under their Proposition II, that Riteway's payment, without question, of Norman Wholesale's statements over a period of more than two years, estopped or precluded, it from disputing the correctness of said statements, on the theory that the account between them became "an account stated and settled." Since it appears in this case that plaintiff's failure to question, or dispute, the account, as represented on those statements, was due to fraud practiced upon him and his employees at Riteway by defendants' agent Williams, the fact that the account was not disputed until shortly before this action was brought, constitutes no defense. See Verrell v. First Nat'l Bank, 80 Or. 550, 157 P. 813, 815; 1 C.J.S. Account Stated § 37b(2)d, p. 717. The converse of this rule was also applied in Foster v. Dwire, 51 N.D. 581, 199 N.W. 1017, 51 A.L.R. 21.

■ Defendants also refer to testimony from which it might be inferred that all of the merchandise listed on Norman Wholesale's invoices to Riteway was actually delivered to it, and that the only evidence to the contrary is circumstantial. Though they advance no such proposition, their inference is that the finding of plaintiff's loss from Williams' fraud, inherent in the judgment, is without sufficient evidence to support it. We do not agree. Defendants cite no authorities rendering the circumstantial evidence incompetent, or preventing the trial judge from basing his judgment largely on that kind of evidence, and we think, after examining it, that it was of sufficient competency and probative value to support the judgment. This court has consistently held that in a jury-waived law action, a general judgment constitutes a finding of every fact necessary to support it and that it has the same force, effect, and conclusiveness as a judgment in accord with a verdict. See Western Steel Erection Co. v. Gatlin, Okl., 319 P.2d 607; Livingston v. Bonham, Okl., 308 P.2d 657.

■ Defendants also argue, under their Proposition II, that plaintiff was guilty of laches in not instituting this action before September 1955, in view of the fact that some of his losses occurred as early as 1952. On the other hand, plaintiff, besides contending that the doctrine of laches is inapplicable to this kind of action, cites authorities to the effect that such actions are regarded as timely, if brought within the two-year statutory period, after discovery of the fraud (12 O.S.1951 § 95). With the latter we agree. There is no question but that the action was brought well within two years from the time plaintiff first discovered that Riteway had paid Norman Wholesale for cigarettes and merchandise that had not been left with it for resale there. Whether or not plaintiff should have made this discovery before he did, was, under the circumstances, a question of fact, which, like the question of his claimed negligence, hereinbefore dealt with, has been resolved in his favor by the trial court's judgment. From our examination of the evidence, we cannot say that said judgment, as it pertains to this question, lacks competent evidence reasonably tending to support it. It therefore cannot be reversed on that ground.

As we have found in defendant's arguments insufficient cause for reversing the trial court's judgment, it is hereby affirmed.

DAVISON, C. J., and HALLEY, JACKSON, IRWIN and BERRY, JJ., concur.

JOHNSON, J., dissents.