2006 OK CIV APP 119

STATE of Oklahoma, ex rel. Carroll FISHER, Insurance Commissioner, in his capacity as Insurance Commissioner and as Receiver for Heritage National Insurance Company, Plaintiff/Appellee,

v.

HERITAGE NATIONAL INSURANCE COMPANY, a licensed domestic insurer in the State of Oklahoma, in Receivership, Defendant,

v.

Managed Care Administrators, Inc., Appellant.

No. 101,701.

Court of Civil Appeals of Oklahoma, Division No. 4.

June 6, 2006.

Certiorari Denied Sept. 25, 2006.

816

George W. Velotta II, Derryberry, Quigley, Solomon & Naifeh, Oklahoma City, OK, for Appellee.

Thomas E. Prince, Prince Law Office, P.C., Edmond, OK, for Appellant.

Opinion by DOUG GABBARD II, Presiding Judge.

¶1 Managed Care Administrators, Inc. (MCA), appeals the trial court's order denying its proof of claim against the State of Oklahoma ex rel. Carroll Fisher, Insurance Commissioner (the Commissioner or Receiver), as receiver for Heritage National Insurance Company (Heritage). Based on the record and law, we affirm.

## FACTS

¶2 MCA and Heritage are separate but related companies. Heritage is a health care insurance company; MCA processes claims made by Heritage's insureds. Under an agreement between the two companies, MCA receives six percent of Heritage policy premiums in exchange for processing claims.

¶3 The companies are owned by the same person. Their offices are at the same address but in different suites. They maintain separate books and records. Both companies were managed day-to-day by the same president, Brad Frost, and the same Chief Financial Officer, Wakon Redcorn. Redcorn's duties included transferring funds from Heritage to MCA to pay MCA's fees.

¶4 In 2001, the Commissioner learned of indisputably illegal dealings by Frost and Redcorn, which involved taking—in the owner's words, "embezzling"—a million dollars from Heritage. A Report of Financial Condition prepared by Hallie J. Burnett, examiner in charge, for the Oklahoma Insurance Department summarized the situation as follows: the owner and Frost "made combinations of loans and short-term investments to themselves and affiliated entities in amounts exceeding the statutory limitations" in violation of Oklahoma statutes. The report stated that Frost had retained $421,701, and Redcorn had retained $896,064 from Heritage.

¶5 In May 2001, the owner of Heritage and MCA requested that Frost and Redcorn repay the funds improperly taken from Heritage. In May and June of 2001, Frost and Redcorn caused Heritage to pay MCA between $630,000 and $961,000 as claims processing fees,[1] then caused MCA to pay them $515,000 in improper consulting fees and loans, and then repaid Heritage $425,000.

¶6 On June 22, 2001, Frost and Redcorn ceased working for Heritage and MCA, and Heritage consented to an order of supervision by the Commissioner. On March 15, 2002, Heritage was placed in receivership, with the Commissioner being appointed Receiver.

¶7 In December 2003, MCA filed an application for approval of proof of claim. It asserted that after the Commissioner became involved in the case, he approved MCA to continue processing claims by Heritage's insureds. MCA asserted Heritage owed it $227,372.44 for claims processing fees performed from July to November 9, 2001. This figure was later amended to $402,960.

¶8 Receiver answered, asserting MCA had been overpaid by more than that amount by virtue of the transfers from Heritage made by Frost and Redcorn. Receiver also relied on Paragraph 3.4 of the claims processing agreement between Heritage and MCA, which stated:

> Administrator Indemnity. The Administrator [MCA] agrees to indemnify HNIC [Heritage] and hold HNIC harmless against any and all loss, damage and expense, including court costs and attorney's fees, with respect to this Agreement resulting from or arising out of the Administrator's or the Administrator's agents breach of this Agreement or negligent, dishonest, fraudulent or criminal acts or omissions of the Administrator, Affiliates of the Administrator, or the Administrator's employees or agents, acting alone or in collusion with others.

¶9 MCA responded, asserting Frost and Redcorn acted on their own, not as officers of MCA or Heritage. MCA also asserted that Paragraph 3.5 of the agreement required Heritage to indemnify MCA for loss, damage, and expense "resulting from and arising out of claims, demands or lawsuits brought against the Administrator in administering the Policies or to recover benefits under the Policies ...." which, it argued, included the loss it sustained from Frost and Redcorn's fraudulent conduct. MCA asserted the two indemnification paragraphs prevented either party from holding the other responsible.

¶10 Following a hearing, the trial court denied MCA's claim, specifically finding:

1. There is some dispute as to the exact amount taken. The Insurance Department examiner's report states that "Monies paid (by Heritage) to Managed Care Administrators in 2001 exceeded the contract amount by over $700,000." In its order, the trial court concluded that the exact amount "is not as yet determined."

1. The Receiver has proven its Affirmative Defense of set-off/over-payment by the preponderance of the evidence. HNIC has overpaid fees to MCA for claims processing.

2. The acts of Frost and Redcorn in taking the funds of MCA ... were done as officers/employees of MCA and are covered by Paragraph 3.4 of Claims Processing Agreement by which MCA has agreed to indemnify and hold HNIC harmless for this conduct. They were not acting as dual agents of HNIC and MCA when these funds were improperly taken.

¶ 11 MCA appeals.

## STANDARD OF REVIEW

■ ¶ 12 While this case ultimately involves a claim for money damages, it was brought under the Uniform Insurers Liquidation Act, specifically 36 O.S.2001 § 1918, which is a special proceeding in the nature of equity. *State of Okla. ex rel. Crawford v. Indem. Underwriters Ins. Co.*, 1997 OK CIV APP 37, ¶ 8, 943 P.2d 167, 169. Accordingly, the trial court's judgment will be affirmed unless it is against the clear weight of the evidence or is contrary to law or established principles of equity. *Id.*

## ANALYSIS

¶ 13 MCA raises three propositions of error: first, that the trial court erred in admitting hearsay evidence of the financial examination report; second, that the trial court erred in finding that Heritage was entitled to set-off because Frost and Redcorn acted outside the scope of their authority and were dual agents who defrauded both parties; and third, that both indemnity clauses apply to prevent either party from holding the other responsible.

### 1. *The Hearsay Objection*

■ ¶ 14 In its first proposition, MCA asserts that the trial court committed reversible error when it allowed into evidence the Report of Financial Examination prepared for the Oklahoma Insurance Department, and testimony by the Deputy Insurance Commissioner as to his conversation with the report's author. MCA asserts the report was inadmissible hearsay, and was the only evidence supporting the trial court's holding that Frost and Redcorn were acting in their capacities as officers of Heritage and MCA when the transfers of money were made. MCA takes the position that the two officers were not acting as officers, but were acting out of self-interest by using the transactions as "a conduit" for raiding the companies.

¶ 15 MCA argues that the report and evidence are hearsay which do not come within the 12 O.S. Supp.2005 § 2803(8) exception for investigative reports. That subsection allows admission of records of regularly conducted agency actions taken pursuant to a duty imposed by law. However, Subsection (8)(b) states that the exception does not apply to "investigative reports prepared by or for a government, a public office or agency when offered by it in a case in which it is a party."

¶ 16 Clearly, the report was produced pursuant to a duty imposed by law. It was authorized by 36 O.S.2001 § 309.2(A), which allows the Commissioner to conduct an "examination" of any insurance company as the Commissioner deems appropriate, but requires the Commissioner to do so at least once every three years. While use of the term "examination," instead of "reports," arguably shows an intent to exclude such documents from § 2803(8)(b) coverage, it seems more likely the legislature never considered the matter.

¶ 17 Reference to the Evidentiary Subcommittee's Note following 12 O.S.A. § 2803(8) indicates that this subsection "make[s] clear that police investigative reports and similar types of self-serving reports will not be admissible in evidence. This will then carry forward the rule in Oklahoma that police investigative reports are not admissible in evidence." The Note also refers to *Houston v. Pettigrew*, 1960 OK 152, 353 P.2d 489, in which the Supreme Court held that the rule disallowing police reports into evidence is based on the idea that hearsay evidence is incorporated in those reports. *Id.* at ¶ 10, 353 P.2d at 492.

¶ 18 The examination report in this case does not contain hearsay evidence on matters

of fault, but outlines an examiner's analysis of existing physical evidence, that is, the financial records. It was done in accordance with established financial practices and cannot be considered similar to a police investigative report. For this reason, we hold that § 2803(8)(b) did not exclude the examination report from admission.

¶ 19 We also note that the examiner's testimony was available by deposition and that neither party disputed the report's conclusion that MCA was overpaid. The real dispute between the parties is whether the overpayments were made by Heritage due to actions by Frost and Redcorn while they acted within their scope of authority, or whether they were acting outside their authority when they made the transfers for the purpose of defrauding both companies. Thus, even if this evidence was improperly admitted, we find no prejudice.

¶ 20 Finally, we note that the trial court's finding that Heritage overpaid MCA is amply supported by other evidence besides the examination report. From the hearing's opening statements, everyone involved agreed that Frost and Redcorn transferred the money from Heritage to MCA. Even the companies' owner reluctantly testified that "from a paperwork standpoint, monies moved from Heritage to MCA."

### 2. *MCA's Agency Liability*

¶ 21 In its second proposition, MCA argues that Heritage is not entitled to a setoff for monies paid in excess of the contract amount, since Frost and Redcorn were not acting within the scope of their authority with MCA when they obtained these payments. MCA further argues it had no knowledge of their wrongdoing and should not be imputed with that knowledge since they were dual agents of both MCA and Heritage.

¶ 22 Whether a principal is liable to a third party for the fraudulent acts of an agent depends upon whether there was an agency, whether the agent purported to be acting for the principal, and whether the fraudulent act was within the scope of the business intrusted to the agent. *Hurt v.*

*Garrison,* 1942 OK 239, 192 Okla. 66, 133 P.2d 547 (syllabus of the court # 1). If so, the knowledge of the agent will generally be imputed to the principal who will be liable for the agent's actions. *Gibson Oil Co. v. Hayes Equip. Mfg. Co.,* 1933 OK 142, ¶ 8, 163 Okla. 134, 21 P.2d 17, 19. The rationale behind the imputed knowledge rule is the presumption that an agent will communicate his information to his principal. This same presumption applies when an agent represents two parties with their consent, in which instance he is referred to as a "dual agent." *First State Bank of Keota v. Bridges,* 1913 OK 553, 39 Okla. 355, 135 P. 378 (syllabus of the court # 2). Regarding dual agents, the Oklahoma Supreme Court in *Newsom v. Watson,* 1946 OK 16, ¶ 13, 177 P.2d 109, 111, cited with approval 3 C.J.S. *Agency* § 271:

> Where a principal knows that his agent is also acting for the party adversely interested in the transaction, and yet consents to let him act as his agent, the principal is estopped from denying notice and knowledge which the agent has during the negotiation.

*See also Kammerlocher v. City of Norman,* 1973 OK 35, 509 P.2d 470. The rule of imputed knowledge in dual agency situations has been adopted by most courts which have considered it, but is subject to certain restrictions, limitations, and exceptions. *See* V. Woerner, Annotation, *Imputation of Knowledge of Agent Acting for Both Parties to Transaction,* 4 A.L.R.3d 224 § 3 (1965).

¶ 23 In a single agency situation, knowledge will not be imputed where: (1) the agent has a duty not to disclose the information; (2) where the agent's conduct raises a clear presumption that he would not communicate the facts to his principal, such as where he was acting on his own business, where he was acting in his own personal interest adverse to the principal and where the principal was unaware of the adverse interest, where he was committing fraud against the principal, or where some other reason existed for him to conceal facts from his principal; or (3) where the person claiming benefit of the notice colluded with the agents in his fraudulent actions. *U.S. Fid. & Guar. Co. v. Shirk,* 1908 OK 58, ¶ 10, 95 P.

218, 220; *Allen & Scott Inc. v. Stahl,* 1938 OK 3, ¶13, 181 Okla. 527, 75 P.2d 204, 207. Knowledge will also not be imputed if the agent is the sole representative of the principal in the transaction. *Aetna Cas. & Surety Co. v. Local Bldg. & Loan Ass'n,* 1933 OK 137, ¶23, 19 P.2d 612, 616. However, knowledge may be imputed where the principal received a benefit from the fraudulent conduct. *Shrier v. Morrison,* 1960 OK 95, 357 P.2d 196; Restatement (Second) of Agency § 282 (1958), 3 Am.Jur.2d *Agency* § 283 (2002).

¶24 Courts have generally applied the rules of imputed knowledge used in single agency situations to those in dual agency situations. In other words, the effect in a dual agency is usually the same as if the two principals are represented by two separate and distinct individuals, often reducing the question in a controversy between the principals or in a controversy between a third party and one of the principals, to the simple, yet determinative question of "Which principal was the dual agent in fact representing in the questioned transaction?" V. Woerner, Annotation, *Imputation of Knowledge of Agent Acting for Both Parties to Transaction,* 4 A.L.R.3d 224, 229 (1965).

¶25 Indisputably, in the present case, Frost and Redcorn acted as agents for MCA, had actual authority to file claims for consulting fees due from Heritage to MCA, and, in filing the fraudulent claims, appeared to be acting within the scope of the business that MCA had entrusted to them. However, Frost and Redcorn, as dual agents, were representing neither of their principals in these transfers, but did so as part of a scheme to embezzle funds for their own benefit. Accordingly, no reasonable person would be likely to infer that the agents communicated information regarding their improper conduct to either principal. Nor were they the sole representatives of the principals in these transactions, since other employees assisted in the processing of the claims and checks.[2]

¶26 However, in May and June 2001, Frost and Redcorn caused Heritage to pay to MCA improper processing fees of between $630,000 and $961,000. Frost and Redcorn then caused MCA to pay them $515,000 in improper consulting fees and loans. Although testimony was presented indicating that MCA received no benefit from the actions of Frost and Redcorn, the evidence indicates that MCA retained between $115,000 and $446,000 in improper funds received from Heritage that were never paid out to Frost and Redcorn. Clearly, by retaining this amount, MCA obtained a benefit from its agents' misconduct. For this reason, it is "estopped" as a matter of law from denying knowledge of the dual agents' improper actions and is liable therefor. We find the trial court setoff in favor of Heritage and against MCA is supported by the clear weight of the evidence.

### 3. *The Indemnity Clauses*

■ ¶27 In its third proposition, MCA argues that the trial court erred in applying an indemnity clause included in the claims processing agreement between MCA and Heritage. Paragraph 3.4 states that MCA agreed to indemnify and hold harmless Heritage for any losses with respect to the agreement resulting from MCA's agents' negligent, dishonest, fraudulent, or criminal acts. The trial court held the acts of Frost and Redcorn in taking the funds of MCA were covered by the clause.

¶28 MCA asserts the trial court should have also considered the next clause in the agreement, Paragraph 3.5, in which Heritage agreed to indemnify and hold harmless MCA for any loss resulting from claims, demands, or lawsuits brought against MCA "in administering the Policies or to recover benefits under the Policies" arising from Heritage's negligent, dishonest, fraudulent, or criminal acts or omissions. MCA asserts that *both*

---

2. Similarly, in the *Aetna* case, other employees and agents of the principal were involved in receiving and processing the agent's fraudulent checks. The Oklahoma Supreme Court cited the sole representative rule and stated that "in the receipt of the money by the defendant company, the agent, Campbell, was not the only agent of the defendant connected with the transactions. We, therefore, hold in this connection that the knowledge of the agent, Campbell, was not imputed to the defendant." *Aetna,* 1933 OK 137 at ¶25, 19 P.2d at 617.

clauses apply here to prevent *either* party from holding the other responsible for Frost and Redcorn's wrongful acts.

¶ 29 We find that the two clauses are not mirror images of each other, but address two different subjects. Paragraph 3.4, the clause applied by the trial court, requires MCA to indemnify Heritage for losses with respect to the agreement. Paragraph 3.5 applies to claims involving MCA's administration of individual policies of insurance or attempts to recover benefits under those policies. Because this action does not involve an insured or a claim brought by an insured, Paragraph 3.5 is not applicable.

## CONCLUSION

¶ 30 For the above and foregoing reasons, the trial court's judgment is affirmed.

¶ 31 AFFIRMED.

RAPP, V.C.J., and REIF, J., concur.