2004 OK CIV APP 39

**Sheila PRINCE, Administratrix of the Estate of Hubert A. Ballard, Deceased, Plaintiff/Appellant,**

v.

**B.F. ASCHER COMPANY, INC., a Kansas Corporation; Menley & James Laboratories, Inc., a subsidiary of Menley and James, Inc., a Delaware Corporation; Stewart Drugs, Inc. d/b/a Stewart & Wood Drug Co., an Oklahoma Corporation; Dennison Labs, Inc.; and Smithkline Beecham, Inc., d/b/a Glaxosmithkline, Defendants/Appellees.**

No. 99,221.

Court of Civil Appeals of Oklahoma, Division No. 3.

Feb. 17, 2004.

Kevin E. Krahl, Charles G. Braun, Hornbeek, Krahl, Vitali & Braun, P.L.L.C., Oklahoma City, OK, for Plaintiff/Appellant.

Thomas E. Steichen, Richard M. Eldridge, Eldridge, Cooper, Steichen & Leach, P.L.L.C., for Defendant/Appellee, B.F. Ascher Company, Inc., a Kansas Corporation.

Robert D. Baron, Coyle Law Firm, Coyle Law Firm, Oklahoma City, OK, for Defendant/Appellee, Menley & James Laboratories, Inc., a subsidiary of Menley & James, Inc., a Delaware Corporation.

Robert W. Nelson, Thomas A. Paruolo, Whitten, Nelson, McGuire, Wood, Terry, Roselius & Dittrich, Oklahoma City, OK, for Defendant/Appellee, Stewart Drugs, Inc. d/b/a Stewart Wood Drug Co., an Oklahoma Corporation.

James K. Secrest, II, Jenny R. Ebersole, Don W. Danz, Secrest, Hill & Butler, Tulsa, OK, for Defendant/Appellee, Dennison Labs, Inc.

Robert H. Alexander, Jr., John J. Love, The Law Office of Robert H. Alexander, Jr., P.C., Oklahoma City, OK, for Defendant/Appellee, SmithKline Beecham Corporation, d/b/a GlaxoSmithKline.

Opinion by BAY MITCHELL, Presiding Judge.

¶1 On August 1, 1999, decedent Hubert A. Ballard died of acute propylhexedrine intoxication after intravenously injecting the extracted contents of a Benzedrex® nasal inhaler in order to experience a stimulative effect.[1] Propylhexedrine is the active ingre-

---

1. Ballard was found dead on his bathroom floor with a syringe stuck in his leg and a disassembled Benzedrex® nasal inhaler nearby.

dient in Benzedrex®, an over-the counter nasal decongestant. At the time of his death, Ballard had been a habitual abuser of the propylhexedrine in Benzedrex® for well over twenty years. ·No other drugs were present in Ballard's system at the time of his death. Defendant/Appellee GlaxoSmithKline (GSK) manufactured Benzedrex® from 1949 to 1990. GSK sold the product rights to Defendant/Appellee Menley & James Laboratories, Inc. in 1990. Menley & James sold the rights to Defendant/Appellee B.F. Ascher Company, Inc. in 1998. Defendant/Appellee Dennison Laboratories, Inc. assembled the product for both Menley & James and B.F. Ascher. Ballard purchased his last inhaler at a pharmacy owned and operated by Defendant/Appellee Stewart & Wood Drug Co.

¶ 2 Sheila Prince, Ballard's daughter and administratrix of his estate, filed a wrongful death suit under negligence, failure to warn, breach of warranty, and products liability theories.[2] She alleges Ballard's misuse of Benzedrex® was foreseeable because, as early as the 1970's, Appellees were aware— through medical literature, the public media, and direct complaints—of the potential for abuse of their product. Prince further argues that despite knowing their product was addictive and subject to abuse, Appellees continued to sell Benzedrex® in a container easily dismantled by hand. She contends Benzedrex® is a defective and unreasonably dangerous product due to its packaging, potential for abuse, toxicity, and insufficient warning label.

¶ 3 All five Appellees filed motions for summary judgment. The trial court granted each one. Prince appeals.[3] Her points of error are: (1) summary judgment was improper given Ballard's foreseeable misuse of the Benzedrex® inhaler; (2) Appellees owed a duty to Ballard under a negligence theory; (3) a question of material fact exists as to whether the warning on the product label was sufficient; and (4) Appellee Dennison Laboratories is a proper party under a prod-

ucts liability theory even though it is a limited assembler, not a manufacturer.

## Standard of Review

¶ 4 Whether the trial court's entry of summary judgment was proper is a question of law we review *de novo. Manley v. Brown,* 1999 OK 79, ¶ 22, 989 P.2d 448, 455. In a *de novo* review, we have plenary, independent, and non-deferential authority to determine whether the trial court erred in its application of the law and whether a dispute exists as to any genuine issue of material fact. *Kluver v. Weatherford Hosp. Auth.,* 1993 OK 85, ¶ 14, 859 P.2d 1081, 1084. Like the trial court, we examine the pleadings and summary judgment evidentiary materials submitted by the parties to determine if a genuine issue of material fact is in dispute. *Carmichael v. Beller,* 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053. In so doing, we view the facts and all reasonable inferences arising therefrom in the light most favorable to the non-moving party. *Id.*

## Facts

¶ 5 Benzedrex® is a nasal inhaler designed for the symptomatic treatment of nasal congestion resulting from head colds and hay fever. The federal Food and Drug Administration (FDA) has approved propylhexedrine for use as an active ingredient in topical nasal decongestants such as Benzedrex®. 21 C.F.R. § 341.20(b)(9). It classifies Benzedrex® a nonnarcotic product that may be sold without a prescription. 21 C.F.R. § 1308.22. The FDA has concluded propylhexedrine is safe in the dosage ranges used as a nasal decongestant. 41 Fed.Reg. 38,402 (1976); *see also* 59 Fed.Reg. 43,386 (1994).

¶ 6 The ·FDA mandates the specific language as to directions for use and warnings that must appear on all Benzedrex® containers. *See* 59 Fed.Reg. 43,396 (1994) Comment 13; and 59 Fed.Reg. 43,404 (1994) Comment

**2.** Price failed to defend her breach of warranty claim against Appellees' motions for summary judgment and such theory of liability does not form the basis of any of Prince's grounds for appeal herein.

**3.** This appeal from the trial court's decision sustaining Appellees' motions for summary judgment is submitted without appellate briefs in conformance with the procedures for the appellate accelerated docket, Okla. Sup.Ct. R. 1.36, 12 O.S.2001, Ch 15, App.

25. When the FDA published its Tentative Final Monograph for Nasal decongestants it specifically addressed the issue that "certain OTC nasal decongestant products containing propylhexedrine have the capability of producing a 'high' and therefore have a potential for abuse." 50 Fed.Reg. 2,226 (1984) Comment 12. Acknowledging the reported instances of abuse "among individuals, most of whom had a history of drug abuse, who knowingly misused the drug," the FDA concluded "[t]he agency believes that propylhexedrine should be available as an inhalant nasal decongestant because it is safe and effective, when used as instructed in the labeling." *Id.* at 2,227. In establishing the required warnings of OTC inhalant products, the FDA considered and rejected a warning that stated "Caution: Not for use by mouth," agreeing with a comment that such a warning could potentially incite abuse by stimulating the imagination of consumers and noting that the mandated dosage and directions "clearly indicate that these inhalants are to be used intranasally." 50 Fed.Reg. 2,234 (1985) Comment 29.

¶ 7 The Benzedrex® label reads as follows:

DIRECTIONS: This product delivers in each 800 milliliters of air 0.40 to 0.50 milligrams of propylhexedrine. Adults and children (6–12 years) with adult supervision: 2 inhalations in each nostril not more often than every 2 hours. Children under 6: consult a physician. This inhaler is effective for a minimum of 3 months after first use. Keep inhaler tightly closed.

DO NOT EXCEED RECOMMENDED DOSAGE. This product may cause temporary discomfort such as burning, stinging, sneezing, or an increase in nasal discharge. The use of this container by more than one person may spread infection. Do not use this product for more than three days. Use only as directed. Frequent or prolonged use may cause nasal congestion to recur or worsen. If symptoms persist, consult a physician. KEEP THIS AND ALL MEDICATION OUT OF THE REACH OF CHILDREN. Ill effects may result if taken internally. In case of accidental overdose or ingestion of contents, seek professional assistance or contact a Poison Control Center immediately. As with any drug, if you are pregnant or nursing a baby, seek the advice of a health professional before using this product.

At deposition, Prince admitted the warning on Benzedrex® package conveys the product may be poisonous if ingested.

¶ 8 During his initial years of propylhexedrine abuse, Ballard would dismantle the Benzedrex® inhaler's plastic tube and swallow the cotton pledget inside, which contained the FDA-approved mixture of propylhexedrine, menthol, and lavender oil. Sometime in the late 1970's or early 1980's, Ballard's stepson showed him how to create a solution using water and a syringe to extract the propylhexedrine from the cotton pledget, which solution Ballard would inject directly into his bloodstream using a hypodermic needle. This method caused a more immediate "high" while avoiding the foul taste associated with swallowing the cotton pledget. Ballard continued to abuse propylhexedrine in this way throughout the 1980's and 1990's until the date of his death, injecting the extracted contents of as many as three to five Benzedrex® inhalers a day.

¶ 9 Prince maintains Ballard's addiction did not cause him to suffer any identifiable injury until his death. In support of this claim, she notes Ballard had not been to a doctor once during the ten-year period prior to his fatal overdose and was never diagnosed with any affliction attributable to propylhexedrine abuse.

¶ 10 Prince's expert conceded Ballard's injection of the propylhexedrine solution was an abnormal, aberrant use of Benzedrex®. He further declared no scientific evidence exists to show the inhaler is addictive or can cause physical harm when used as directed by the product labeling. Finally, Prince's expert testified that when Ballard would break apart a Benzedrex® inhaler, remove the cotton pledget, and use water and a needle to extract the propylhexedrine, the solution he created was no longer Benzedrex®.

¶ 11 The evidence further shows those members of Ballard's family who were aware of his abuse repeatedly told Ballard his behavior could be harmful. Ballard himself

acknowledged to his step-son, a fellow propylhexedrine abuser, that if Ballard did not end his misuse of the drug it could kill him. Ballard's step-son testified at deposition that both he and Ballard were aware their misuse of Benzedrex® was wrong.[4] Prince admitted "[t]he extraction of the propylhexedrine from the inhaler is a misuse of the inhaler." Ballard's knowledge in the years prior to his death of risks associated with his propylhexedrine abuse is thus without question.

*Products Liability*

 ¶ 12 Oklahoma adopted the theory of manufacturers' products liability in *Kirkland v. General Motors Corp.*, 1974 OK 52, 521 P.2d 1353. To maintain a products liability action, a plaintiff must prove: (1) the product was the cause of the injury; (2) the defect existed in the product at the time it left the manufacturer's possession and control (if the action is against the manufacturer) or at the time of sale for public use (if the action is against the retailer or supplier); and (3) the defect made the article "unreasonably dangerous" to plaintiff or his property, meaning dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases the product with the ordinary knowledge common to the community as to its characteristics.[5] *Id.*, ¶¶ 26, 29–31, 521 P.2d at 1362–63. The burden on the plaintiff in a products liability action is "a large and heavy one . . . . for he must prove that his injury has been caused not necessarily by the negligence of the Defendant but by reason of a defect 'built in' and existing at the time of injury." *Id.*, ¶ 36, 521 P.2d at 1364.

 ¶ 13 The first question we must address is whether there is a substantial controversy as to whether Benzedrex® caused Ballard's death. We find there is not. An extracted ingredient is not the legal equivalent of the parent product. As Prince's expert acknowledged, the substance Ballard injected was not Benzedrex®, but a solution

Ballard created from the extracted active ingredient in Benzedrex®: propylhexedrine. *See e.g., United States v. Youngblood*, 949 F.2d 1065, 1066 (10th Cir.1991) (holding under Oklahoma law that methamphetamine remains a Schedule II controlled substance even though the FDA has approved for over-the-counter sale both Rynal and Vicks nasal inhalers, which contain a combination of ingredients including diluted methamphetamine isomers); *United States v. Viernes*, 763 F.Supp. 1068 (D.C.Hawai'i, 1991) (holding government decriminalization of desoxyephedrine when used in limited quantities and in concert with other ingredients in Vicks Inhalers does not imply decriminalization of the drug when not mixed into a Vicks Inhaler; in other words, although desoxyephedrine is a methamphetamine, it does not follow that desoxyephedrine is Vicks Inhaler); *State v. Erban*, 429 N.W.2d 408, 411 (N.D.1988) (holding desoxyephedrine to be a controlled substance despite the fact that it is available in small amounts on an over-the-counter basis as part of the approved preparation in Vicks nasal inhalers). Accordingly, there is no substantial controversy that the product Benzedrex® used as a nasal inhaler did not cause Ballard's death; the extracted propylhexedrine used as a stimulant did.

 ¶ 14 Turning to the second prong of the products liability analysis, Oklahoma law recognizes a consumer's subsequent material alteration precludes recovery because the product cannot be said to have been defective when it left the manufacturer's control. *See Dutsch v. Sea Ray Boats, Inc.*, 1992 OK 155, ¶ 18, 845 P.2d 187, 191 (refusing to hold manufacturer liable where subsequent modifications of boat caused injuries); *Clark v. Continental Tank Co.*, 1987 OK 93, ¶ 23, 744 P.2d 949, 954 (affirming jury verdict for manufacturer where heater/treater was equipped with safety devices when it left manufacturer's control but devices were later removed in the field causing flash fire); *Stuckey v. Young Exploration Co.*, 1978 OK 128, ¶ 22,

---

**4.** 63 O.S.2001 § 465.20 prohibits consumption of substances (excluding liquor) to achieve an intoxicating effect, unless done under the direction or prescription of a doctor.

**5.** Evidence that a product could be made "safer" does not establish that it was less safe than would be expected by the ordinary consumer. *Woods v. Fruehauf*, 1988 OK 105, ¶ 17, 765 P.2d 770, 775.

586 P.2d 726, 731 (affirming summary judgment in favor of manufacturer where cab and chassis of truck had twice undergone substantial modification· after leaving manufacturer's control); *Kimbrell v. Zenith Radio Corp.,* 1976 OK 134, ¶¶ 8, 11, 13, 555 P.2d 590, 592 (affirming trial court's directed verdict for manufacturer of television set where crimped wire that caused subsequent fire could have occurred during repair of set years after purchase). That Ballard broke apart Benzedrex® inhalers after purchasing them in order to extract the active ingredient to obtain a stimulant effect is undisputed. Such a subsequent material alteration precludes liability on the part of the manufacturer or seller.

¶ 15 We also may deem a product defective if a manufacturer fails to give directions or warnings on the container as to its use. *See Smith v. U.S. Gypsum Co.,* 1980 OK 33, ¶ 9, 612 P.2d 251, 253. "If the warnings are unclear or inadequate to apprise the consumer of the inherent danger, the product may be defective, particularly where a manufacturer has reason to anticipate danger may result from the use of his product." *Steele v. Daisy Mfg. Co.,* 1987 OK CIV APP 64, ¶ 11, 743 P.2d 1107, 1109. Manufacturers, however, are not required to foresee that consumers will fail to read the product's warnings and then use the product in a manner that the instructions expressly warn against. *Hutchins v. Silicone Specialties, Inc.,* 1993 OK 70, ¶ 20, 881 P.2d 64, 67; *see also* RESTATEMENT (SECOND) OF TORTS § 402A, cmt. j (1965). "Only where the seller has reason to anticipate that danger may result from a particular use, may he be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition." *Duane v. Oklahoma Gas & Elec. Co.,* 1992 OK 97, ¶ 4, 833 P.2d 284, 286. "If a plaintiff is using the product for some purpose for which it was not intended and is consequently injured, he should not recover." *Kirkland,* ¶ 45, 521 P.2d at 1366.

¶ 16 "The plaintiff must establish that the failure to warn was a proximate,

producing cause of the injuries received." *Duane,* ¶ 4, 833 P.2d at 286. "Where the danger or potentiality of danger is known or should be known to the user, the duty to warn does not attach." *Id.,* ¶ 6, 833 P.2d at 287; *see also, Atkins v. Arlans Dept. Store of Norman, Inc.,* 1974 OK 62, 522 P.2d 1020 (holding although it may be foreseeable that a child· may throw a lawn dart at another person, the product was not designed with such misuse in mind, thus alleged .design defect was not the proximate cause of the injury and manufacturer not liable).

¶ 17 That Ballard knew of the danger posed by abusing the propylhexedrine in Benzedrex® is uncontroverted. He ignored the directions on the container by breaking apart the inhaler and extracting and injecting the active ingredient. He did not use Benzedrex® for its intended purpose as a nasal inhaler but as an illegal stimulant. FDA regulations specify the particular warnings that must appear on Benzedrex® containers. Prince admits the warnings on the package clearly conveyed the contents could be poisonous if taken internally. Had Ballard heeded the product warnings and instructions for use, there is no evidentiary material that the product would have been incapable of causing him any harm. There is also no evidence demonstrating Benzedrex® was defective when it left Appellees' control. Rather, the product became dangerous only as a result of Ballard's after-purchase modifications thereto and knowing, aberrant misuse thereof.[6] Summary judgment was thus properly granted on the products liability claims.

### Negligence

¶ 18 The elements of negligence are: "(1) the existence of a duty on part of defendant to protect plaintiff from injury; (2) a violation of that duty; and (3) injury proximately resulting therefrom." *Brigance v. Velvet Dove Restaurant, Inc.,* 1986 OK 41, ¶ 7, 725 P.2d 300, 302. "The existence of a duty is an essential element of a negligence claim; without it the claim must fail." *Hen-*

---

**6.** Because we find Prince's products liability claim fails, we need not address her additional contention that Appellee Dennison Labs, Inc. was a proper party defendant as a limited assembler of Benzedrex® under a products liability theory.

*ry v. Merck and Co., Inc.,* 877 F.2d 1489, 1492 (10th Cir.1989) (citing Oklahoma law). "Just because the defendant has created a risk which harmed the plaintiff that does not mean that, in the absence of some duty to the plaintiff, the defendant will be held liable." *Nicholson v. Tacker,* 1973 OK 75, ¶ 11, 512 P.2d 156, 158. Indeed, "[b]ecause duty and liability are matters of public policy they are subject to the changing attitudes and needs of society." *Brigance,* ¶ 12, 725 P.2d 300, 303. Accordingly, "[w]hether a duty exists is a legal question to be determined by the court." *Henry,* 877 F.2d at 1492.

■ ¶ 19 For example, the Supreme Court has held a tavern owner has no liability to an intoxicated adult who voluntarily consumes alcoholic beverages to excess and sustains injuries (to himself) as a result of his intoxication. *Ohio Cas. Ins. Co. v. Todd,* 1991 OK 54, ¶ 20, 813 P.2d 508, 512. "[A]s a matter of public policy drunken persons who harm themselves are responsible for their condition, and should not prevail either under a common law or statutory basis." *Ohio Cas.,* ¶ 14, 813 P.2d at 511. In concluding the legal system should not reward inebriates for their immoderation, the *Ohio Cas.* court concurred with the following view enunciated in *Kindt v. Kauffman,* 57 Cal. App.3d 845, 129 Cal.Rptr. 603, 610 (1976):

> When the restraint of reason and the ability to care for one's self are perverted by a conscious, self-indulgent act of voluntary intoxication which temporarily casts off those powers, no societal or personal wrong, nor violation of public or social policy is accomplished or violated if the actor is alone held answerable for his injury.... Governmental paternalism protecting people from their own conscious folly fosters individual irresponsibility and is normally to be discouraged.... To go yet another step and allow monetary recovery to one who knowingly becomes intoxicated and thereby injures himself is in our view morally indefensible.

*Ohio Cas.,* ¶ 15, 813 P.2d at 511–12. If public policy does not condone a cause of action by inebriates suing for injuries caused by their own intoxication, we see no reason why it should permit addicts to recover for injuries stemming from their illicit drug use.

■ ¶ 20 Furthermore, "[t]he general rule is that, absent special circumstances, no duty is imposed on a party to anticipate and prevent the intentional or criminal acts of a third party. Oklahoma follows that rule." *Henry,* 877 F.2d at 1492, (*citing Joyce v. M & M Gas Co.,* 1983 OK 110, ¶ 7, 672 P.2d 1172, 1173). "Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence, particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Joyce,* ¶ 5, 672 P.2d at 1174 (*citing* RESTATEMENT (SECOND) OF TORTS, § 302B cmt. d (1965)). Oklahoma recognizes two types of special circumstances that create a duty to anticipate and prevent the illegal acts of a third party: "where the actor is under a special responsibility toward the one who suffers the harm or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." *Joyce,* ¶ 5, 672 P.2d at 1174. Prince has failed to show that such special circumstances creating a duty to foresee criminal acts existed between Ballard and Appellees.

■ ¶ 21 We also conclude the trial court was correct in granting Appellees' motions for summary judgment on the alternate ground that Ballard's criminal use of the propylhexedrine in the Benzedrex® inhaler as a stimulant was the supervening cause of his death. The law in Oklahoma is clear that before a defendant will be liable for a plaintiff's injuries, the plaintiff must prove that his injuries resulted directly and proximately from the defendant's negligence. *Woodward v. Kinchen,* 1968 OK 152, ¶ 10, 446 P.2d 375, 377. "The law does not charge a person with all possible consequences of his acts. Rather, the law ignores the remote cause and looks for the proximate cause of the injury." *Henry,* 877 F.2d at 1494. "The proximate cause of an event must be that which in a natural and continuous sequence, unbroken by an independent cause, produces the event

and without which the event would not have occurred." *Gaines v. Providence Apartments*, 1987 OK 129, ¶ 4, 750 P.2d 125, 126–27. "Where the negligence complained of only creates a condition which thereafter reacts with a subsequent, independent, unforeseeable, distinct agency and produces an injury, the original negligence is the remote rather than the proximate cause thereof." *Id.*, ¶ 4, 750 P.2d at 127.

¶ 22 Generally, the question of proximate cause is one for the jury. *Thompson v. Presbyterian Hosp., Inc.* 1982 OK 87, ¶ 12, 652 P.2d 260, 263. The question becomes an issue of law when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries. *Smith v. Davis*, 1967 OK 161, ¶ 5, 430 P.2d 799, 800. In that circumstance, it is for the court to determine as a matter of law whether the evidence is sufficient to show intervening factors broke the causal nexus between the original actor's careless behavior and the resulting injury. *Thompson*, ¶ 13, 652 P.2d at 264. "An intervening factor sufficient to break the causal nexus is a supervening cause." *Henry*, 877 F.2d at 1495. When an intervening cause is found to be supervening, "the original negligence may be said to undergo a legal metamorphosis into a remote cause or 'mere condition.'" *Thompson*, ¶ 15, 652 P.2d at 264.

¶ 23 In Oklahoma, the test to determine whether a cause is supervening is whether it is: "(1) independent of the original act; (2) adequate of itself to bring about the result; and (3) one whose occurrence was not reasonably foreseeable." *Brigance*, ¶ 21, 725 P.2d at 305; *Strong v. Allen*, 1989 OK 17, ¶ 9, 768 P.2d 369, 371; *Thompson v. Presbyterian Hosp., Inc.*, 1982 OK 87, ¶ 15, 652 P.2d

260, 264. "When the intervening act is intentionally tortious or criminal, it is more likely to be considered independent." *Henry*, 877 F.2d at 1495, (*citing* RESTATEMENT (SECOND) OF TORTS, § 302B, cmt. d (1965)); *see also Lefthand v. City of Okmulgee*, 1998 OK 97, ¶¶ 9–10, 968 P.2d 1224, 1226 (holding police officer's decision to delay pulling vehicle over until after vehicle left restaurant merely furnished a condition by which injury was possible, but it was criminal act of driver in fleeing officer that was the supervening cause of the driver crashing his vehicle into a nearby house; the driver's flight was independent of the officer's timing of the traffic stop and adequate by itself to bring about passenger's injury).

¶ 24 Ballard's injection into his veins of a solution made from the propylhexedrine he extracted from Benzedrex® was certainly independent of Appellees' manufacture and sale of the product as a nasal inhaler, and unquestionably sufficient in and of itself to bring about Ballard's death. In addition, as discussed above, Appellees were not required to anticipate Ballard's criminal acts in this regard. Accordingly, Prince cannot overcome Appellees' supervening cause defense and her negligence claim fails as a matter of law. Summary judgment was properly granted on these claims as well.

¶ 25 AFFIRMED.

HANSEN, J., and JOPLIN, J., concur.