2013 OK CIV APP 7

Timothy THORNTON and Tammy Thornton, Plaintiffs/Appellees/Counter–Appellants,

v.

FORD MOTOR COMPANY, Defendant/Appellant/Counter–Appellee,

and

Nowata Ford, unknown Oklahoma Limited Liability Company, Edward Taylor, Gregg Carter, and Thomas Plummer, Defendants.

Nos. 108,089, 108,090, 108,091, 108,092, 108,093.

Court of Civil Appeals of Oklahoma, Division No. 3.

Dec. 28, 2012.

finding Ford liable for the plaintiffs' actual damages, attorney fees and costs. In all other respects, the judgment is AFFIRMED.

## SUMMARY OF FACTS & PROCEDURAL HISTORY

¶2 Within seven months of Ford's approval of the sale of an existing Ford dealership in Nowata, Oklahoma, to Ibex, LLC, (Ibex), d/b/a Nowata Ford, the new dealership (Dealership) had to close its doors for business. Based on pre-closing conduct of Dealership's employees, *e.g.*, executing a bogus check, failing to deliver vehicles, title certificates or to pay balances owed on trade-in vehicles, several customers filed separate lawsuits against Ibex and/or Nowata Ford, Edward Taylor and Thomas Plummer, and Ford,[1] alleging, *inter alia*, breach of contract, fraud, deceit, negligent misrepresentation, and negligence. Ford and Taylor unsuccessfully sought dismissal of each action, all of which were subsequently consolidated for discovery and dispositive motions. Thereafter the trial court granted several customers' partial motion for summary judgment and ordered the Oklahoma Motor Vehicle Commission to issue them title certificates. Several customers settled their lawsuits.

¶3 Following the denial of Ford's motion for summary judgment, the seven lawsuits which remained ("Customers")[2] were consolidated for non-jury trial. Ford was the only defendant in attendance at the trial held September 14–17, 2009,[3] during which the trial court approved the parties' agreement to admit numerous exhibits into evidence and denied Ford's pretrial motion *in limine* regarding Customers' expert witness.

¶4 Customers' case in chief included the testimony of Customers and the settling customers. Over Ford's objections, Customers

Todd Alan Cone, William E. Maddux, Todd A. Cone Law Offices, Nowata, Oklahoma, for Plaintiffs/Appellees.

Mary Quinn Cooper, Mary E. Kindelt, Eldridge Cooper Steichen & Leach, PLLC, Tulsa, Oklahoma, and Timothy S. Millman, Neil L. Johnson, Berkowitz, Oliver, Williams, Shaw & Eisenbrandt, L.L.P., Kansas City, Missouri, for Defendant/Appellant.

WM. C. HETHERINGTON, JR., Judge.

¶1 The trial court entered judgment in favor of numerous plaintiffs after a non-jury trial in their fraud and negligence action against Ford Motor Company (Ford) and its defunct car dealership in Nowata, Oklahoma. Ford's appeal and the plaintiffs' counter-appeal were consolidated for review. For the following reasons, we REVERSE the order

1. In CJ–2008–130, Timothy and Tammy Thorton also included the owner of the former Ford dealership, Gregg Carter, as a defendant, but they subsequently dismissed all claims against him without prejudice.

2. For the record we count the plaintiffs with their spouses as a single customer. The seven customers whose actions were ultimately tried to the court ("Customers") are: Timothy and Tammy Thorton (CJ–2008–130), Jerry and Carolyn McIntosh (CJ–2008–137), Raymond Mandrell (CJ–2008–149), Betsey Gorley (CJ–2008–150), Jimmy Denman (CJ–2008–153), Richard Drake (CJ–2008–156), and Kimberly Teague (CJ–2008–183).

3. Plummer disappeared at some unknown point in time. At the trial, Taylor's bankruptcy discharge was admitted into evidence.

also called a prior car dealer, Mark Roberts, as an expert witness. For its case in chief, Ford called one witness, Gregory Houston, an employee who was directly involved with approving Dealership as a Ford dealer. After closing arguments and receipt of each party's proposed findings of fact and conclusions of law, the trial court identified in open court which of those he had adopted, modified or rejected and also rendered his decision.

¶ 5 In a detailed journal entry of judgment filed five months after trial due to the parties' disagreement over its form and content, the trial court granted judgment in favor of Ford, Plummer and Ibex, against the claims of two Customers.[4] In favor of the remaining five Customers, the trial court granted judgment against Ford for their actual damages but *sua sponte* reduced each amount based on equitable principles. After finding clear and convincing evidence "the tortious conduct of Defendants, Plummer and [Ibex], has been fraudulent and oppressive, both to [Customers] and to the public" and the same defendants "have been guilty of reckless disregard for the rights of others,"[5] the trial court awarded $100,000 in punitive damages against Plummer and Ibex and in favor of each of the five Customers.[6] The trial court also ordered Ford to pay each Customer a sum certain in attorney fees and costs. Ford's timely appeal of the judgment was followed by a counter petition-in-error filed by Customers. Ford thereafter amended its appeal to include the trial court's postorder

granting Customers' motion to modify the judgment as to attorney fees.

## TRIAL COURT'S ORDER

¶ 6 The difficulty in this negligence case is deciphering which of the many commingled findings of facts and conclusions of law in the sixteen page order corresponds to the four theories of recovery the trial court decided in favor of customers, *i.e.*, agency-based vicarious liability, "negligent approval of the dealer," statutory liability under Title 47 O.S. 2001 § 561 et seq., and general negligence. In summary, approximately half of the 106 paragraphs address the terms of the Ford Sales and Services Agreement (FSSA), effective February 5, 2008, and Ford's conduct thereafter (post-FSSA), both relevant to the issue of Ford's control over Dealership and whether it was (1) Ford's agent, the liability for whose employees' wrongs may be imputed to Ford, as Customers argued, or (2) an independent dealer, the liability for whose employees' wrong Dealership alone would bear, as Ford argued.

¶ 7 Based primarily on the FSSA,[7] *inter alia*, the trial court found Dealership was an "independent dealer," but agreed with Customers that "Dealership projected apparent authority for Ford." The order basically set out two reasons for this decision. First, after finding on February 6, 2008, Ford 1) learned from an employee of the Oklahoma Motor Vehicle Commission (OMVC) that Plummer and Taylor had not obtained the required state license to operate a dealer-

---

**4.** Neither of the two Customers, Raymond Mandrell and Richard Drake, have appealed the judgment in favor of the three Defendants.

**5.** In the immediately preceding paragraph, the trial court found the actions of the three defendants, Taylor, Plummer, and Ibex, "were intentional and so shocking that, under Oklahoma Law, punitive damages are appropriate such that the Court could infer malice and evil intent."

**6.** Although there is no express underlying actual damages judgment against Plummer and Ibex, we assume such judgment was granted based on the punitive damages award against both defendants.

**7.** It is unclear whether the trial court also may have concluded Ford had a contractual duty, by its finding "under the [FSSA] Ford had the right

and the obligation to take action upon discovery of the fraudulent activities." We find no corresponding language in the FSSA and Customers' citation fails to support the record for the trial court's finding. Nevertheless, the Georgia Appeals Court has reviewed similar language in *DaimlerChrysler Motors Company LLC Inc. v. Clemente*, 294 Ga.App. 38, 668 S.E.2d 737, 748 (2008). The Court there held these provisions are included in franchise agreements between automobile manufacturers and dealers to protect the tarnishing of franchisor's reputation, its other franchisees, and its product and trademark, and found it did not place an affirmative duty on the franchisor to police the dealership. We find these authorities persuasive and to the extent the judgment against Ford is based on a contractual duty, it is reversed.

ship, and 2) "threw its considerable weight and influence in support of the application and in [its] participation in securing the license to sell new and used vehicles," the trial court concluded "in the *initial* application process, Ford acted *as an agent* in order to secure [the license to sell new vehicles] from [OMVC]."

¶ 8 The second reason is best understood in light of the findings of fact pertaining to subsequent events: 1) OMVC did not receive the license application until February 21, 2008; 2) on March 3, 2008, Plummer "was arrested and charged with providing a forged identification number with false Social Security number to the Oklahoma Department of Public Safety"; 3) on March 11, 2008, Plummer and Taylor "finally obtained approval from the OMVC to operate a dealership"; and 4) on March 12, 2008,[8] Mr. Haynes, "the first Ford customer to be victimized by the Ford dealership .... filled out paperwork for a 'credit check.'"

¶ 9 Without identifying which of the last two dates Dealership opened for business, the trial court found Ford "did manage and control dealership transactions *on day one* of the dealership relating to trading in used vehicle[s] by the dealership customers, specifically, when participating in securing the Oklahoma Motor Vehicle Application." In a separate paragraph, the trial court also found "Ford did manage and control the administrative detail *on day one* of the dealership, *i.e.*, the paperwork [for] the car sales transactions a[t] the dealership."

¶ 10 The remaining findings of fact and conclusions of law address Ford's direct liability for its pre-FSSA conduct, *i.e.*, "negligent approval of the Dealership," to which the trial court referred in its order as Ford's "initial mistake." Although the order indicates this process began on August 6, 2007 when "[Plummer] and [Taylor] completed a fraudulent Prospective Dealer Application," the record demonstrates, the approval process began in June of 2007, with Ford's receipt of the former dealer's proposed sale agreement to Ibex. After an extension for resubmission of the sales agreement, Ford denied in mid-October 2007 the proposed sale for lack of supporting documentation of Plummer's experience in the car industry. Upon receipt of sales reports from prior dealers for whom Plummer had worked, Ford approved the proposed sale in mid-November 2007 *conditioned* upon the final real estate closing between the former dealer and Ibex. The closing finally occurred February 5, 2008.

¶ 11 As we interpret the order, Ford's "initial mistake" is comprised of several acts and/or omissions that occurred at different points during the approval process which generally involved investigation of the financial and experience information submitted by Plummer and Taylor, review of the results of their background checks, and compliance with state law and its own procedures. Regarding these acts and/or omissions, the trial court found "... it was foreseeable that an inexperienced, undercapitalized dealership could cause harm to the consuming public." The court further found that Ford "was negligent under the law," identifying in separate findings that Ford had 1) "an obligation under Oklahoma law, including but not limited to the law in Title 47, [§ ] 561, when approving the change in dealership, to verify the integrity of the process" and 2) "a duty to exercise ordinary care in the appointment process and the approving of an authorized Ford dealer."

¶ 12 Despite finding Ford's "limited"[9] background check "revealed no negative findings," the trial court concluded Ford had breached its duties when it did not "comply with Oklahoma Statutes that govern dealership applications" or "follow its comprehensive procedures and processes in evaluating the Ibex dealership application." In three separate paragraphs, the court found Ford (1) "did not verify the information, as expected," (2) "failed to verify and perform due

---

8. Pursuant to the record evidence, the date given in the order regarding Mr. Haynes's first visit to Dealership, March 12, 2007, should instead be "March 12, 2008."

9. The undisputed testimony and evidence established the reference to the background check as "limited" meant it covered the past ten years, not the scope of the search as Customers attempted to represent below and on appeal.

diligence on the Nowata Ford application," and (3) "failed to verify and identify people and information by the use of social security numbers." Finally the court determined Ford "was negligent to look at a financial statement and the numbers on [it] and not determine the application's credibility for truthfulness" and "allowed exempt accounts not readily convertible into [cash] to be listed on an application."

¶ 13 Regarding the post-FSSA acts and/or omissions for which the trial court also based its agency finding, he found Ford *"did violate a duty* to the [Customers] when it threw its considerable weight and influence in support of the application and in [its] participation in securing the license to sell new and used vehicles." The legal basis for this particular duty is not specifically identified. However the trial court's next paragraph, stating *"but for* the opportunity to acquire this existing Ford dealership in Nowata *and* the considerable influence of [Ford] with the [OMVC], Ibex's application for approval of [a license for] the dealership to sell new and used vehicles in Oklahoma would not have happened," indicates application of general negligence principles.

¶ 14 The trial court's ultimate finding of liability against Ford essentially mixes agency and negligence considerations:

> The Court further finds that Ford, did, in fact, *control* the initial day-one operation of the dealer. Thereafter it failed when the *initial mistake,* that being the appointment of the dealer, *compounded itself* by the continued operation of [Dealership]." (Emphasis added.)

Interpreting the order as a whole, the trial court apparently viewed Ford's pre-FSSA "initial mistake" and its post-FSSA "influence and participation" in the licensing process and "day-one control" as a successive chain of closely connected events which together were the proximate or direct cause of Customers' injuries. *See Jackson v. Jones,* 1995 OK 131, ¶ 9, n. 18, 907 P.2d 1067, 1073.

10. By Supreme Court order filed January 4, 2011, Ford's brief in chief filed December 30, 2010 was substituted for its brief in chief filed October 22, 2010.

### FORD'S APPEAL

¶ 15 Ford's first position challenges the trial court's imputation of liability based on the existence of an agency relationship between it and Dealership. Ford next argues it has no legally cognizable duty—either common law, statutory or under general principles of negligence law.

### Standard of Review

¶ 16 Different standards of review apply to the issues raised in this appeal. Agency is generally a question of fact to be determined by the trier. *A–Plus Janitorial & Carpet Cleaning v. Employers' Workers' Compensation Association,* 1997 OK 37, ¶ 32, 936 P.2d 916, 930 (citing *Bell v. Tollefsen,* 1989 OK 149, ¶ 10, 782 P.2d 934, 938). Only where the facts relied upon to establish the existence of the agency are undisputed and conflicting inferences cannot be drawn therefrom is the question of whether or not an agency exists one of law for the court. *Keel v. Titan Const. Corp.,* 1981 OK 148, ¶ 3, 639 P.2d 1228, 1230. In a negligence action, the existence of a duty, whether common law, statutory, or otherwise, raises a question of law which requires a *de novo* review. *Iglehart v. Board of County Commissioners of Rogers County,* 2002 OK 76, ¶ 11, 60 P.3d 497, 502.

### AGENCY–BASED VICARIOUS LIABILITY

¶ 17 In its amended brief in chief,[10] Ford argues Dealership is an "independent dealer," instead of an actual agent, relying on the FSSA's express denial of a principal-agent relationship and other provisions giving Dealership control of its day to day operations. It also argues the trial court's imposition of vicarious liability that is based on apparent authority is contrary to Oklahoma case law recognizing dealerships are not the agents of manufacturers. Ford claims the only evidence presented at trial on the issue of apparent authority was some of Customers' testimony as to their reliance on Ford's trademark, the latter of which it claims Okla-

homa courts have specifically rejected as creating apparent authority. Finally, Ford argues, even if an agency relationship were proven, it cannot be held vicariously liable for "Dealership's allegedly fraudulent and/or tortious conduct because it would have placed its actions outside the scope of Ford's business." [11]

### Actual Authority

¶ 18 We first address Ford's contention in its reply brief that the trial court "made no finding of actual agency authority given by Ford." As Ford acknowledges on appeal, actual authority is created by a principal's manifestation of consent *to the agent* that he is authorized to act on the principal's behalf and subject to his *control. Agee v. Gant,* 1966 OK 31, ¶ 20, 412 P.2d 155, 160. When the alleged principal and agent have a written contract, as here, the question whether they have created an agency relationship is determined by the intent and effect of the contract language and the evidence of their actual conduct. *Enterprise Management Consultants, Inc. v. State ex rel. Oklahoma Tax Commission,* 1988 OK 91, ¶ 6, n. 12, 768 P.2d 359, 362. If the facts show actual control by the principal, an agency is established regardless of the contract language. *Id,* ¶ 6, n. 13 and 15.

¶ 19 We conclude a finding of no actual agency relationship between Ford and Dealership is implied from the trial court's analysis of the FSSA and its findings that Nowata Ford was an "independent dealership, owned and operated by Defendant, Ibex, LLC," Ford "gave no dealership employee authority to act upon [its] behalf," and that "under [the FSSA] Ford *did not have the right to control day to day operations and activities of the dealership.*" [12] (Emphasis added.) Responsibility for an agent's injury to third parties is placed on the party that *hires, directs and controls* the agent. *Price v. TLC Health Care Inc.,* 2004 OK 8, ¶ 8, 85 P.3d 838, 841. Concerning hiring, directing and controlling, the trial court made findings which clearly support Dealership was not Ford's actual agent.[13]

¶ 20 Further, our research reveals the trial court's two findings that Ford had "reasonable control over the use of its trademark" and it "did, in fact, control the initial day-one operations" are consistent with decisions by courts from other jurisdictions holding a motor vehicle manufacturer/franchisor may exercise some control to protect its national identity, reputation, and trademark from abandonment without creating an agency relationship with its dealer/franchisee. *Summit Automotive Group, LLC v. Clark and Kia Motors,* 298 Ga.App. 875, 681 S.E.2d 681 (2009); *DaimlerChrysler Motors Company, LLC v. Clemente,* 294 Ga.App. 38, 668 S.E.2d

---

11. Ford's sole authority for this argument, *State ex rel., Fisher v. Heritage National Insurance Company,* 2006 OK CIV APP 119, 146 P.3d 815, similarly involved fraudulent conduct which caused monetary damages, but unlike this case, it was undisputed the wrongdoers were actual agents whose fraudulent conduct injured only one of their two principals. In this case, the issue of Dealership's status as an agent or independent contractor is disputed, *see Jordan v. Cates,* 1997 OK 9, 935 P.2d 289, and the victims of its employees' conduct were innocent third parties.

12. The trial court did not identify Ford and Dealership as having a "franchise relationship" in its order. Unlike at trial, neither party refers to the FSSA as a franchise agreement, despite the record evidence to the contrary. In addition, Ford relies on Oklahoma statutes that regulate franchises between motor vehicle manufacturers and Oklahoma dealers, 47 O.S.2001 § 561 *et seq.,* and both parties distinguish and/or rely on other state court decisions addressing the effects of various types of control retained or exercised by automobile franchisors over its franchisees.

13. The trial court found Ford *did not dictate, influence or control* either a) the setting of prices of Dealership's vehicles, b) where Dealership's customers got their financing for car purchases, c) how and where Dealership got its financing, d) what Dealership did with its funds, e) when and how Dealership advertised, or f) any human resource matters like hiring and firing, or supervising its employees. The trial court also found Ford *did not* own any part of Ibex, LLC, *did not* share in Dealership's profits or losses, *did not* receive any proceeds from Dealership's sale of the vehicles at issue to Customers, *did not* sell vehicles directly to the public, *did not* provide financing for the Customers' purchases of vehicles, *did not* require Dealership to use Ford's internet advertising programs, *did not* own the real estate upon which Dealership was operated, and *did not* have any direct employees stationed or operating near Nowata.

737 (2008); *Ortega v. General Motors Corp.*, 392 So.2d 40 (Fla.Dist.Ct.App.1981).

¶ 21 More importantly, both findings are consistent with recent Oklahoma appellate court decisions holding it is the *"detailed assertion of control* that may make a franchise agreement the source of an agency relationship." (Emphasis in original.) *Bayhylle v. Jiffy Lube International, Inc.*, 2006 OK CIV APP 130, ¶ 13, 146 P.3d 856; *see Gabler v. Holder and Smith, Inc.*, 2000 OK CIV APP 107, ¶ 17, 11 P.3d 1269, 1274 (both citing *Enterprise Management Consultants, Inc. v. State ex rel. Oklahoma Tax Commission*, 1988 OK 91, ¶ 16, n. 15, 768 P.2d 359, 362). In *Gabler*, the Court of Civil Appeals found a franchisor's "exercise of some control" and the passing of "some monetary consideration" from the franchisee to the franchisor was insufficient proof of the required detailed assertion of control to establish an agency relationship. *Id.*, 2000 OK CIV APP 107, ¶ 18, 11 P.3d 1269. Similar conclusions have been reached by other courts throughout the country.[14]

¶ 22 The court's finding that Ford "did control the initial day-one operations" is consistent with control that is allowed under Oklahoma statutes regulating franchises between new motor vehicle manufacturers and dealers, 47 O.S.2001 § 561 et seq. (the Act).[15] Although 47 O.S.Supp.2005 § 565(A)(12)(a)(1)-(3) expressly prohibits a motor vehicle manufacturer from owning, operating, controlling, or acting in the capacity of a new motor vehicle dealer, § 565(A)(12)(b)(2) provides an exception to those prohibited acts for up to one year "during the transition from one dealer to another dealer if the dealership is for sale at a reasonable price and on reasonable terms and conditions to an independent qualified buyer."[16]

¶ 23 From our review of the record, we conclude the evidence supports the trial court's express finding of Dealership's status as an independent dealer and an implied finding that Ford did not have sufficient control over Dealership to support an agency relationship based on actual authority.

### Apparent Authority

¶ 24 The existence of an actual agency relationship is not a prerequisite to establishing apparent authority.[17] *Stephens v. Yamaha Motor Co., Ltd., Japan*, 1981 OK 42, ¶ 8, 627 P.2d 439, 441. "Apparent authority applies to *actors* who appear to be agents *but are not*, as well as to *agents* who act *beyond the scope of their actual authority.*" (Emphasis added.) *Restatement Third, Agency*, § 2.03, Comment a. Therefore, the trial court's finding that Dealership is an independent dealer does not eliminate resolution of this issue for purposes of Ford's vicarious liability.

¶ 25 Ford admits it *"authorized* Dealership *to sell and service* Ford cars and vehicles to customers pursuant to the terms of the Ford Sales and Service Agreement (FSSA)," and that under its terms Ford also "agreed to sell cars and trucks to Dealership." Further, the trial court found acts or omissions by Dealership's employees were "fraudulent" and "tortious." On this record, it is undisputed the same acts or omissions occurred during the hours of operations required by the FSSA *and* as part of the *authorized* sales transactions and related chain of transactions with

---

**14.** *DaimlerChrysler Motors Inc. v. Clemente*, 294 Ga.App. 38, 668 S.E.2d 737 (2008); *Cislaw v. Southland Corp.*, 4 Cal.App.4th 1284, 6 Cal. Rptr.2d 386, 393 (Cal.App. 4 Dist.1992); *Ortega v. General Motors Corporation*, 392 So.2d 40 (Fla. Ct.App 4th Dist.1980).

**15.** The Act is discussed in more detail under the section titled "Direct Liability."

**16.** Because one of the Act's express purpose is to "avoid undue control by a manufacturer" and the Act requires a new motor vehicle dealer to have a bona fide contract or franchise agreement to sell new or unused vehicles with a manufac-

turer, we presume the standards included in such agreements that protect the trademarks of the manufacturer/franchisor from abandonment as well as upholding its name/reputation, product quality, etc. are not the types of control prohibited by this Act.

**17.** Although an agency relationship based on apparent authority alone supports vicarious liability against Ford, it is still necessary to decide the actual agency issue argued below since the trial court also granted judgment on an alternative theory of recovery, *i.e.*, negligent approval of the dealership.

Customers, *e.g.*, accepting cash deposits or trade-in vehicles, completing credit/loan applications.

¶ 26 "A principal *is* subject to *vicarious liability* for a *tort* committed by an agent in dealing or communicating with a third party on or purportedly on *behalf of the principal* when actions taken by the agent with *apparent authority* constitute the tort or *enable the agent to conceal its commission.*" *Restatement Third of Agency*, § 7.08 and § 7.03(2)(b). *See also Shrier v. Morrison*, 1960 OK 95, 357 P.2d 196, 201 (when a principal puts an agent into a position and while acting with apparent authority the agent commits a fraud on a third person, the principal is subject to liability to the third person for the agent's frauds). Therefore, only if there is evidence to support the existence of an agency relationship based on apparent authority may Ford be found vicariously liable for the fraudulent and tortious actions by Dealership's employees committed while performing Ford-authorized transactions that concealed discovery of the wrongs.

¶ 27 Apparent authority results from a "manifestation by the principal *to a third person* that another is his agent." *Stephens*, 1981 OK 42, ¶ 8, 627 P.2d at 441. The principal's "manifestation may be made directly to a third person or *to the community by signs or by advertising.* But, apparent authority exists only to the extent that it is *reasonable* for the third person dealing with the agent to believe that the agent is authorized." (Emphasis added.) *Id.; see also Wheeler v. Puritan Insurance Company*, 1986 OK 33, ¶ 12, 720 P.2d 729, 731 (rejecting apparent agency argument because "there [was] no mention in the record of any communication, written or oral or by advertisement, that Stewart was an agent of Puritan").

¶ 28 "A manifestation is *conduct* by a person, *observable by others,* that expresses meaning." (Emphasis added.) *Restatement Third of Agency*, § 1.03, Comment b. In Oklahoma, a party alleging apparent authority, as Customers have here, must show three elements to impose liability on the alleged principal for the acts of another: "(1) *conduct of the principal* [which would *reasonably lead* the third party to believe that the agent *was authorized* to act *on behalf of the principal* ], (2) reliance thereon by the third person, and (3) change of position by the third party to his detriment." (Emphasis added.) *Sparks Bros. Drilling Co. v. Texas Moran Exploration Co.*, 1991 OK 129, ¶ 17, 829 P.2d 951, 954. "Apparent authority requires the presence of all three elements." *Diamond Sevens, L.L.C. v. Intelligent Home Automation, Inc.*, 2010 OK CIV APP 131, ¶ 18, 245 P.3d 1260, 1264.

¶ 29 Customers' position, both below and on appeal, focuses on the first element, arguing Ford clothed "Nowata Ford" with apparent authority by placing the Ford trade mark oval sign on Dealership's premises and permitting its use in newspaper and telephone advertisements. They argue the Ford oval "jointly represents Ford and Ford dealers," not simply that "Ford vehicles are sold here," and point to Ford's immediate removal of the sign due to the negative impact resulting from Dealership's closing.

¶ 30 The Oklahoma Supreme Court has twice taken the position against the reasonableness of a third person's belief that a display of "distinctive colors and trade mark signs" creates an agency relationship based on apparent authority. Under the facts of Ford's first authority, *Coe v. Esau,* 1963 OK 1, 377 P.2d 815, the plaintiff, who sought to recover damages to his automobile caused from the installation of a faulty oil filter gasket by the station operator, alleged the operator was the agent of the lessor/premises owner, Continental Oil Company. The Court in *Coe* specifically addressed the prominent display of the name of Continental, or its trade mark name "Conoco," on the station premises and in advertisements of its gasoline and oil products and classified pages in the telephone directory, and held such use "was not sufficient to show a lessee was the agent or employee of the owner." The Court then explained:

It is indeed *a matter of common knowledge and practice* that *distinctive colors and trade mark signs* are displayed at gasoline stations *by independent dealers* of *petroleum product suppliers.* These signs

and emblems represent *no more than notice* to the motorist that a given company's products are being marketed at the station. (Emphasis added.) *Id.*, 1963 OK 1, ¶ 5, 377 P.2d 815, 818.

¶ 31 Almost twenty years later in an action for personal injuries allegedly caused by a tire leak, the Court in *Stephens v. Yamaha Motor Co., Ltd. Japan*, 1981 OK 42, 627 P.2d 439, addressed a similar argument concerning the existence of apparent authority which the appellant based on the display of two Conoco signs at the service station that offered the tire repair service and his belief such service was authorized by Conoco and was part of the services Conoco offered. Part of the Court's analysis in *Stephens* included review of other state court cases finding a plaintiff's testimony was insufficient evidence of reliance to establish apparent agency.[18] Finding the appellant's argument "has no support in reason or authority," the *Stephens* Court explained, "[i]t is a matter of common knowledge that these trade mark signs are displayed throughout the country by *independent dealers*." 1981 OK 42, ¶ 14, 627 P.2d 439, 442. Based on *Coe* and *Stephens*, Ford's trade mark signs do not *alone* create apparent authority. A majority of other state courts reach the same conclusion.[19]

¶ 32 Other than Ford's trademark sign on Dealership's location at the time of the sales transactions, Customers have failed to present any evidence of Ford's manifestation or conduct, observable by them or others, "which would *reasonably lead* them to believe Dealership *was authorized* to sell motor vehicles *on behalf of Ford*." Provisions within the FSSA and Ford's confidential internal reports and documents referring to rural dealers as the Face of Ford, *discovered after* Customers' lawsuits were filed, were clearly not observable to them when the sales occurred and there is no evidence or testimony Customers relied on such. Customers also contend Ford worked with Dealership on a daily basis and helped launch the dealership, but it is undisputed that *no* Ford representatives were ever present at the dealership, making it impossible for Customers to have observed such alleged assistance.[20] Neither was there any testimony that Customers overheard any phone calls between Dealership's employees and Ford representatives.

¶ 33 Customers also claim Dealership's employees believed they worked for Ford. This argument, however, ignores that "apparent agency develops from the acts of the principal himself, not the agent's acts." *Anglo–American Clothing Corp. v. Marjorie's of Tiburon, Inc.*, 1977 OK 165, ¶ 8, 571 P.2d 427, 429; *Stephens*, 1981 OK 42, ¶ 13, 627 P.2d 439, *Diamond Sevens, L.L.C.*, 2010 OK CIV APP 131, ¶ 13, 245 P.3d 1260. *See also Restatement Third of Agency*, § 2.03, Comment c ("Apparent authority applies to any set of circumstances under which it is reasonable for a third party to believe that an agent has authority, so long as the belief is traceable to manifestations of the principal").

¶ 34 Based on *Coe* and *Stephens* and the lack of evidence other than Ford's trademark signs to establish manifestations or conduct by Ford which would *reasonably lead* Customers to believe Dealership was authorized to act on behalf of Ford, we find the trial court erred as a matter of law on the issue of apparent agency. As a result, that part of the judgment based on Ford's vicarious liability for Dealership's employees is reversed. The trial court's express finding that Dealership was an independent dealer and the implied finding of no actual agency is supported by the record and is affirmed.

18. As relevant here, the *Stephens* Court distinguished the facts in the leading case on apparent authority, *Gizzi v. Texaco*, 437 F.2d 308 (C.A.3 (Pa.) 1971), as involving a Texaco service station in which certain equipment *was owned by Texaco* and evidence showed that Texaco *exercised control over the activities at the service station.*

19. *Mobil Oil Corp. v. Bransford*, 648 So.2d 119, 121 (Fla.1995); *Malmberg v. American Honda Motor Co.*, 644 So.2d 888, 891 (Ala.1994); *Shaver v. Bell*, 74 N.M. 700, 397 P.2d 723, 727 (1964); *Sherman v. Texas Co.*, 340 Mass. 606, 165 N.E.2d 916 (1960).

20. The single cite to the record for this part of Customers' apparent authority response establishes daily assistance was simply "by phone call" from a Ford representative in Florida.

## DIRECT LIABILITY

### Statutory Duty

#### Brief Overview of the Act

¶ 35 In 1953, the Legislature enacted an untitled statutory scheme regulating the new motor vehicle industry under Title 47, §§ 561 *et seq.* ("the Act"). The nine-member Oklahoma Motor Vehicle Commission (OMVC), the agency created to regulate and license manufacturers, distributors, dealers, and salesmen of *new and unused* motor vehicles, was vested with the power and authority to "carry out the provisions and objects of this act" and "make and enforce all reasonable rules ... to accomplish such purpose." The Act originally had seven sections, but has since been expanded.[21] *See* 47 O.S.2011 § 561–580.2.

¶ 36 Under the current and the 2001 version of the Act, the latter of which is applicable to the instant case,[22] manufacturers and dealers of new motor vehicles are still required to obtain licenses from the Oklahoma Motor Vehicle Commission (OMVC) before doing any business in this state. *See* § 564 of the Act. To qualify as a "New Motor Vehicle Dealer" under either version, a dealer must hold "a bona fide contract or franchise in effect with a manufacturer." *See* § 562(2) of the Act. In addition, the Act: a) specifies prohibited acts by manufacturers, dealers, and salespersons, § 565(A); b) provides the right to an administrative hearing prior to OMVC's denial, suspension or revo-

cation of a license or imposition of a fine, § 566; and c) permits the OMVC to assess fines up to $10,000 against a manufacturer and $1000 against dealers per occurrence.

#### Judicial and Legislative History of the Act

¶ 37 Interpreting the 1961 version in an action brought by the Oklahoma Motor Vehicle Commission seeking injunctive relief against Mr. Semke for selling new or unused cars to the public without a license,[23] the Court in *Semke v. State ex rel. Oklahoma Motor Vehicle Commission,* 1970 OK 15, ¶ 11, 465 P.2d 441, 445–446, stated it was enacted "pursuant to the Legislature's exercise of its police powers to regulate and license the manufacturers ... dealers and salesmen of new motor vehicles doing business in Oklahoma in order to prevent fraud, imposition and other abuses and to protect and preserve the investments and properties of the citizens of this State." The Court found the Act was "valid and within the constitutional limitations of their police power."

¶ 38 After the Court's decision in *Semke,* the Legislature added numerous reasons to § 561 for regulating the new motor vehicle industry, *e.g.,* "to avoid undue control of the independent motor vehicle dealer" by a manufacturer, "foster healthy competition by prohibiting unfair practices," protect the public from monopolies, prevent disruption of the franchise system of distribution of motor ve-

---

21. Despite amendments to and addition of new sections, the Act, found in Chapter 62 of Title 47 O.S.2011 §§ 561–580, currently defines "New motor vehicle dealer" as "any person, firm, association, corporation or trust not excluded by this paragraph who sells, offers for sale, advertises to sell, leases or displays *new* motor vehicles." (Emphasis added.) § 562(2). However, there has been no change to the Act's original definition of "new and unused motor vehicle." § 562(12).

22. For the record, four of the five vehicles involved in this appeal were *used* motor vehicles, to which a separate act applies but never addressed by the trial court or the parties. *See* Chapter 62A, Title 47 O.S.2011 § 581–588, titled the "Used Motor Vehicle and Parts Dealers Act" by the Court in *Durant v. Changing, Inc.,* 1995 OK CIV APP 20, ¶ 13, 891 P.2d 628, 631. The Legislature enacted this Act in 1980 and created

a separate ten member commission to enforce its provisions. Review of §§ 581–588 reveals no provisions corresponding to § 565.3 and no legislative intent to place a duty like the one the trial court imposed on Ford.

23. The 1961 version of § 561 provided:

The Legislature finds and declares that the distribution and sale of new motor vehicles in the State of Oklahoma vitally affects the general economy of the State and the public interest and public welfare, and that in order to promote the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate and to license motor vehicle manufacturers ... dealers and salesman ... doing business in Oklahoma, in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens in this State."

hicles to the public.[24] These reasons were considered by the Supreme Court in *Northwest Datsun v. Oklahoma Motor Vehicle Commission,* 1987 OK 31, 736 P.2d 516, when reviewing a trial court order that three Datsun dealers lacked standing to sue under the Act in their action protesting the proposed site of a new Datsun franchise more than ten miles from their same line-make franchises.

¶ 39 Regarding their argument based on the 1981 version of § 561, the Court in *Semke* noted the dealers had "isolate[d] certain elements of [§ 561's] language, to the effect the legislation was intended *to promote the public interest and public welfare* " and "*to prevent bankrupting* of motor vehicles dealers [who might otherwise be] caused to fail because of [such] *unfair practices* and competition." *Id.,* 1987 OK 31, ¶ 7, 736 P.2d at 518. The Court found their argument "violates common sense and the tenets of statutory construction" and the "intent should be gathered from the legislation *as a whole.*" (Omitted statutory language supplied in brackets). *Northwest Datsun,* ¶ 7–8, 736 P.2d at 518. Finding "there was no room for rules of construction where the Legislature's intent is plainly expressed," the Court held "the legislation in question *in part* is clearly designed to prevent *unfair practices and unfair competition, which might occur as a result of the superior position which car manufacturers hold over their franchised dealers.*" (Emphasis added.) *Id.,* ¶ 9, 736 P.2d at 519. The Court in *Northwest Datsun* further explained the Act provides a manufacturer's "license may be denied or revoked if [it] engages in *certain practices*

regarding their dealers which the Legislature has apparently classified as *unfair.*" Citing to § 565 of the Act,[25] the Court noted the dealers had never contended their protest of the new franchise involved an unfair practice.

### Trial Court's Interpretation of the Act's Purpose

¶ 40 Incorporating by reference "Title 47 of the Oklahoma Statutes the legislative finding regarding motor vehicle dealers," the trial court construed certain § 561 phrases and found, "[t]his is all in an effort to protect the *public* from practices detrimental *to them* in commerce." The court also found § 561 recognized "in the process of sales of motor vehicles, it's the obligation of the State *to prevent unfair practices,* and further *to prevent bankrupting of motor vehicle dealers,* which is what happened specifically in this case." (Emphasis added.)

### ANALYSIS

¶ 41 We conclude the trial court in this case improperly interpreted the same *isolated* § 561 phrases that were relied on by the dealers in *Northwest Datsun* to reach its conclusion that the intent of § 561 was to prevent detrimental or unfair practices upon customers. As in *Northwest Datsun,* such interpretation fails to determine the intent "from the legislation as a whole."

¶ 42 Since the Court's interpretation in *Northwest Datsun,* several of the original sections of the Act have been amended, including an amendment to § 561 in 1985, and

24. *See* fn 14 for first part of § 561, which simply had two sentences. In 1969, the Legislature replaced the periods after the first and second sentences with commas and made a very long, one-sentence paragraph when it added the following:

and in order to avoid undue control of the independent motor vehicle dealer by the motor vehicle manufacturing and distributing organizations, and in order to foster and keep alive vigorous and healthy competition by prohibiting unfair practices by which fair and honest competition is destroyed or prevented, and to protect the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare, to prevent the practice of requiring the buying of special features, appli-

ances and equipment not desired or requested by the purchaser, to prevent false and misleading advertising, to prevent unfair practices by motor vehicle dealers, manufacturers and distributing organizations, to promote the public safety and prevent disruption of the franchise system of distribution of motor vehicles to the public and prevent deterioration of facilities for servicing motor vehicles and keeping same safe and properly functioning, and prevent bankrupting of motor vehicle dealers, who might otherwise be caused to fail because of such unfair practices.

25. *See Northwest Datsun,* 1987 OK 31, ¶ 7–8, 736 P.2d 516, citing to 47 O.S.1981 § 565(10) and § 565(10)(a), now 47 O.S.2011 § 565(9)(a).

sections were also added. However, after review of the Act, we conclude such legislative changes have not affected the *Northwest Datsun* Court's interpretation of the Act's intent.

¶ 43 Importantly, the "unfair practices" applicable to manufacturers for which the OMVC may deny, revoke or suspend a license, *see* §§ 565(A)(8)-(18), still seek to enforce the Legislature's stated intent in § 561 to protect *new motor vehicle dealers* from, *inter alia,* coercion, intimidation, threats, discrimination, and undue control by motor vehicle manufacturers. The § 561 purpose relied upon by the trial court, "to prevent bankrupting of motor vehicle dealers," is followed by the qualifying phrase "who might otherwise be caused to fail because of such *unfair practices.*" None of § 565(A)'s unfair practices applicable to manufacturers have been alleged or found by the trial court to have caused Dealership's bankruptcy, and none of the same apply to Customers' allegations or the evidence they presented at the trial against Ford.[26] The trial court's interpretation of the Act's purpose is not only contrary to *Northwest Datsun,* but if accepted by this court, would impermissibly expand the protections provided by § 565's unfair practices specific to manufacturers far beyond the Legislature's intended recipients.

### Does the Act Impose A Duty On Motor Vehicle Manufacturers During the Application Process For A Proposed Sale Of A Dealership?

¶ 44 This question has not been addressed by Oklahoma courts. For the following reasons, we reject the trial court's finding the Act imposes a duty on motor vehicle manufacturers, such as Ford, during the application process for a proposed sale of a dealership to protect Customers from undercapitalized and inexperienced dealers.

¶ 45 The only section addressing the issue raised by the court's finding that Ford "did not comply with Oklahoma Statutes that govern dealership applications" is 47 O.S.2001 § 565.3. Unlike two sections of the Act that require manufacturers to act in good faith with dealers and the legal heirs/devisees of a deceased dealer, neither of which are applicable here,[27] there is no duty, good faith or otherwise, imposed by § 565.3 on a manufacturer when considering whether to approve or disapprove a franchised vehicle dealer's proposal to sell, transfer, or assign a franchise agreement. Although § 565.3(A) requires the dealer to "notify the manufacturer or distributor whose vehicles the dealer is franchised to sell of the proposed action," the manufacturer, after receipt of the notice, "*may* make written request of a completed application form and related information *generally utilized by a manufacturer to evaluate such a proposal of review.*" (Emphasis added.) Section 565(B) then mandates "the approval by the manufacturer or distributor of the sale, transfer, or assignment shall not be unreasonably withheld" and if approval is refused, requires notice with specific grounds for refusal within a specified time. The single consequence for a manufacturer's failure to comply with § 565(B)'s notice requirements is automatic approval of the application for the proposed sale of the franchise agreement.

26. The same can be said about the only § 561 purpose which does not refer generally to either the interest, safety or welfare of the general public, *i.e.,* "to prevent the practice of requiring the buying of special features, appliances and equipment by the purchaser." This purpose is enforced by § 565(A)(5)(a), the unfair practice specific to a new motor vehicle "dealer" or "salesperson" when either "has required a purchaser of a new motor vehicle, as a condition of sale and delivery thereof, to also purchase special features, appliances, accessories or equipment not desired or requested by the purchaser and installed by the dealer."

27. Section 565.1 of the Act requires manufacturers to act "in good faith or with good cause" and

follow certain procedures when refusing "to honor the succession to a dealership by any legal heir or devisee under the will of a motor vehicle dealer." Section 565.2 provides a manufacturer must satisfy certain notice requirements, have good cause, and must act in good faith when terminating, canceling or failing to renew any franchise dealer with a licensed new motor vehicle dealer. This latter section's duty of good faith was recognized in *Whiteis v. Yamaha International Corporation,* 531 F.2d 968 (C.A.10 (Okla.), 1976), as allowing compensation for damages sustained by a manufacturer's wrongful termination of a dealer.

¶ 46 We conclude the trial court's interpretation is contrary to the plain language of § 565.3. The Legislature made no specific requirements for the contents of a manufacturer's application or its evaluation of a proposed new motor vehicle dealer. We conclude by § 565.3's clear and unambiguous language, particularly the word "may," [28] that the Legislature intended to give manufacturers broad discretion over the extent of its evaluation when deciding to approve a proposed sale, transfer or assignment of a franchise.

¶ 47 The trial court's interpretation is also contrary to § 564(B) of the Act, by which the Legislature places the duty on the OMVC to gather specific information during its application process for new motor vehicle dealer license applicants. Pursuant to § 564(B), the OMVC

> shall require in such application, or otherwise, information relating to the applicant's financial standing, the applicant's business integrity, whether the applicant has an established place of business and is primarily engaged in the pursuit, avocation or business for which a license, or licenses, are applied for, and whether the applicant is able to properly conduct the business for which a license, or licenses, are applied for, and *such other pertinent information consistent with the safeguarding of the public interest and the public welfare.*

The trial court essentially imposed a duty of care in the approval and evaluation process on Ford that the Legislature squarely placed on OMVC.

■■■■ ¶ 48 When "regulatory statutes" "delineate a defendant's conduct, courts may adopt the conduct *required by the statutes* as that which would be expected of a reasonably prudent person providing courts believe the statutorily required conduct is appropriate for establishing civil liability." *Mansfield v. Circle K Corporation*, 1994 OK 80, ¶ 5–6, 877 P.2d 1130, 1132–33. The Act at issue here clearly does not delineate any required conduct from motor vehicle manufacturers, like Ford, during the approval process under § 565.3. Based on the foregoing authorities and analysis, we find the trial court erred by interpreting the Act as imposing a legal duty on Ford to protect customers from undercapitalized and unqualified dealerships.[29]

## NEGLIGENT APPROVAL
## OF DEALERSHIP

■■■ ¶ 49 The trial court found it was foreseeable an inexperienced, undercapitalized dealership could cause harm to Customers and the consuming public if Ford did not exercise ordinary care "in appointing a dealer" and that such risk of harm was within the range of apprehension. Based thereon, he found Ford had a duty to exercise ordinary care in the appointment and approval process. For its breach of this duty, the trial court found Ford negligently failed "to look at ... the numbers on [the] financial statements" submitted by Plummer and Taylor and "not determine the application's credibility for truthfulness" and as a result, it "allowed exempt accounts not readily convertible into cash to be listed on an application." In addition, Ford was "negligent in not verifying the information on the applications submitted by Taylor and Plummer."

¶ 50 Ford first equates the trial court's "new causes of action" for negligent appoint-

**28.** "May" is ordinarily construed as permissive conduct. *Ledbetter v. Howard*, 2012 OK 39, fn. 20, 276 P.3d 1031; *Shea v. Shea*, 1975 OK 90, ¶ 10, 537 P.2d 417, 418.

**29.** Our conclusion is further supported by the lack of a private right of action, express or implied, provided to third parties, like Customers here. When an appeal raises regulatory or public law issues, this court may consider such issues upon theories not presented below. *Keizor v. Sand Springs Railway Co.*, 1993 OK CIV APP 98, ¶ 6, 861 P.2d 326 (citing *Davis v. Davis*, 1985 OK 85, 708 P.2d 1102). OMVC enforces violations of the Act's provisions, and unlike the regulatory statute considered in *Morgan v. Galilean Health Enterprises, Inc.*, 1998 OK 130, 977 P.2d 357, the Act does not frequently refer to "violations" and does not allow *any* person to bring an action for *any* violation of the Act. Pursuant to § 572 of the Act the private remedies that are provided, *i.e.*, action for damages and/or injunctive relief, are expressly limited to *motor vehicle dealers*. Because Customers are not included in the special class the Act was intended to benefit, the first factor for determining if a regulatory statute implies a private right of action cannot be met. *See Holbert v. Echeverria*, 1987 OK 99, ¶ 9, 744 P.2d, 960, 963.

ment and supervision of Dealership to the common law theory of negligent hiring, retention, or supervision, under which, "[e]mployers are held liable for their prior knowledge of the servant's propensity to commit the very harm for which damages are sought." *N.H. v. Presbyterian Church (USA)*, 1999 OK 88, ¶ 20, 998 P.2d 592, 600. Ford argues this theory is dependent on the existence of an employment or agency relationship, which it contends Customers failed to establish, and therefore, the trial court erred by finding Ford liable.

¶ 51 Instead of addressing Ford's specific argument, Customers instead raise another "special relationship" to justify the trial court's rationale for finding Ford negligent for appointing an undercapitalized and unqualified dealer. They argue the latter parallels the duty of a *corporation* to exercise reasonable and ordinary care in selecting an independent contractor, citing *Restatement Second, Torts*, § 411. They also argue the duty imposed on Ford is analogous to the duty of ordinary care for corporate hospitals to protect patients from incompetent staff physicians as adopted by the Court in *Strubhart v. Perry Memorial Hospital Trust Authority*, 1995 OK 10, 903 P.2d 263.

 ¶ 52 The modified version of the doctrine of corporate responsibility adopted by the Court in *Strubhart* imposes "a duty of ordinary care on hospitals to ensure that: 1) only competent physicians are granted staff privileges, and 2) once staff privileges have been granted to a competent physician the hospital takes reasonable steps to ensure patient safety when it knows or should know the staff physician has engaged in a pattern of incompetent behavior." *Id.*, 1995 OK 10, ¶ 37, 903 P.2d at 271. Although what the hospital knows or should know is similar to the focus in negligent hiring cases,[30] we are not persuaded by Customers' argument for two reasons.

¶ 53 First, the *Strubhart* Court explained the modified version of the doctrine of corporate liability it adopted "is merely a variation, or a reasonable and needed expansion, on our previous cases which have set out the general duty of hospitals to exercise ordinary care and attention for the safety of their patients." 1995 OK 10, ¶ 37, 903 P.2d at 271. Customers do not cite, and our research fails to reveal any previously recognized duty of care for a motor vehicle manufacturing corporation, like Ford. Second, as adopted, the doctrine of corporate liability is limited to *hospitals*, and this Court is not free to expand this duty to motor vehicle manufacturing corporations.

¶ 54 *N.H. v. Presbyterian Church (USA)*, 1999 OK 88, 998 P.2d 592, and Ford's other authority, *Magnum Foods, Inc. v. Continental Casualty Company*, 36 F.3d 1491 (C.A.10 (Okla.), 1994), supports Ford's position of a predicate employment or agency relationship.[31] Our resolution of the issue of an agency relationship requires reversal of the judgment against Ford to the extent it is based on this alternative theory of recovery.[32]

---

30. Under this theory, "the focus of the inquiry is whether the employer had reason to believe that the employee would create an undue risk of harm to others." *Schovanec v. Archdiocese of Oklahoma City*, 2008 OK 70, 188 P.3d 158. "Employers are held liable for their *prior* knowledge of the servant's propensity to commit the very harm for which damages are sought." *N.H. v. Presbyterian Church (USA)*, 1999 OK 88, ¶ 20, 998 P.2d 592, 600. *See also Mistletoe Express Service, Inc. v. Culp*, 1959 OK 250, 353 P.2d 9. These cases, unlike this case, all involve physical assaults upon third parties.

31. *See also Jordan v. Cates*, 1997 OK 9, ¶ 9, 935 P.2d 289, 292, and *Restatement Third, Agency*, § 7.03(1)(b) and § 7.05, "[a] principal is subject to direct liability to a third party harmed by an agent's conduct when the principal is negligent in selecting, supervising, or otherwise controlling the agent."

32. Based on our research, the negligent hiring, supervision and retention cases in Oklahoma all involve physical injuries to third parties. According to one of Customers' authorities, *Restatement Second, Torts*, § 411, this theory's application is limited to "physical harm to third persons" caused by an independent contractor's tortious conduct. The same section specifically notes the lack of sufficient cases holding an employer responsible to a third person for failure to exercise care to employ a contractor who is financially responsible and declines "to express any opinion that there is, or that there is not, any obligation on an employer." Having resolved this issue on other grounds, we make no decision whether it would be applicable to financial/monetary injuries to third parties.

GENERAL NEGLIGENCE

¶ 55 Whether or not a duty exists depends on the relationship between the parties and the general risks involved in the common undertaking. *Delbrel v. Doenges Bros. Ford, Inc.*, 1996 OK 36, ¶ 7, 913 P.2d 1318, 1320–1321. Duty of care is a question of law. *Id.* Whether a defendant stands in such a relationship to a plaintiff that the defendant owes an obligation of reasonable conduct for the benefit of the plaintiff. *Id.*

¶ 56 "Duty of care is not a concept that arises only by statute." *Wofford v. Eastern State Hospital*, 1990 OK 77, ¶ 795 P.2d 516, 519. Duty is "but ... only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Id.* The most important consideration in establishing duty is foreseeability. *Id.* Foreseeability "as an element of duty of care creates a 'zone of risk.'" *Id.* This element is a "minimum threshold legal requirement for opening the courthouse doors" which "must not be confused with the foreseeability element of proximate cause, which is concerned with the direct cause of the specific accident." *Id.*

¶ 57 The trial court in this case found there was a foreseeable risk of harm to Customers and the consuming public if Ford did not exercise ordinary care in appointing a dealer and such risk of harm was within the range of apprehension. More specifically, the trial court found "it was foreseeable that an inexperienced, undercapitalized dealership could cause harm to the consuming public."

[20, 21] ¶ 58 Relying on and applying the five-factor foreseeability test set out in *Morales v. City of Oklahoma City*, 2010 OK 9, ¶ 21, 230 P.3d 869, 878, Ford argues "the notion that Dealership's misconduct was foreseeable for purposes of imposing a negligence based duty on Ford is not grounded in reason and good sense." We find its argument persuasive because in Oklahoma, absent either *special relations* or *special circumstances*, "a defendant has neither a duty of care to the plaintiff nor a duty to anticipate or control the intentional and criminal acts of a third person against that plaintiff."

33. Consequently, we need not address the issues raised by Customers' counter-appeal or Ford's

See *J.S. v. Harris*, 2009 OK CIV APP 92, ¶ 9, 227 P.3d 1089, 1093 and *Prince v. B.F. Ascher Co., Inc.*, 2004 OK CIV APP 39, 90 P.3d 1020, 1028 (both relying on *Joyce v. M & M Gas Co.*, 1983 OK 110, ¶ 5, 672 P.2d 1172, 1173–74). "Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence, particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Id.*

¶ 59 The trial court adopted a common law duty between a motor vehicle manufacturer and its dealer, based upon facts which in all respects are statutorily regulated. As in *Comer v. Preferred Risk Mutual Insurance Co.*, 1999 OK 86, ¶ 16, 991 P.2d 1006, 1013, we are not inclined to create a common law duty where the Legislature has failed to impose a statutory one. That part of the judgment finding Ford liable for Customers' actual damages and ordering Ford to pay attorney fees and costs is **REVERSED.** In all other respects, the judgment is **AFFIRMED.**[33]

BELL, P.J., and MITCHELL, J., concur.

appeal of the trial court's post-trial order that modified its original award of attorney fees.